In the Matter of the Application of Foy Productions, Ltd., and Principal Film Exchange, Inc., Petitioners, for an Order Pursuant to Article 78 of the Civil Practice Act, against Frank P. Graves, as Commissioner of Education of the State of New York, Respondent, Annulling the Determination of the Respondent in Refusing to License the Motion Picture " Tomorrow's Children," and Directing That a License for Same Forthwith Issue.*

Third Department, March 16, 1938.

---

* Confirming 164 Misc. 479.

*Goldstein & Goldstein* [*Jonah J. Goldstein* and *Lawrence Kovalsky* of counsel], for the petitioners.

*Ernest E. Cole* [*Charles A. Brind, Jr.,* of counsel], for the respondent.

McNamee, J.   Various applications were made by the petitioners to the State Education Department for a license to display a motion picture, and its speaking parts, entitled "Tomorrow's Children." The picture was reviewed and rejected successively between May 5, 1934, and August 20, 1937, by the reviewers of the picture division of the Department of Education, by the director of the division, and again by the reviewers upon a revision of the picture, and finally by the Commissioner of Education of the State. The grounds of rejection and of refusal were that the picture was "immoral," "will tend to corrupt morals," and "will tend to incite to crime." In connection with the argument the picture was viewed by this court.

A display of the picture opens with a foreword, which indicates its purpose and content, and which states, among other things, that sterilization is an operation performed on human beings to prevent the production of children; that it is a form of birth control; that it is "an immoral means to a desirable end."

Among other things and briefly, the picture portrays a Catholic priest preaching a sermon against sterilization, a group of welfare women being orally instructed in the theory and its consequences, young doctors in a hospital discussing its efficacy. Then is represented a drunkard and his poverty-stricken, feeble-minded family, with its sick, crippled, and criminal members, and a normal, attractive foster daughter. The welfare workers are shown later as inducing the father and mother to submit themselves and their children to sterilization in exchange for " help," including the normal foster child. In the depiction of the foster daughter, the young woman refuses to submit, escapes, is pursued, imprisoned, and is brought before the court, sentenced to submit to the operation, is seen on the operating table, prepared for the surgeon's knife, and finally as being released on the sudden discovery that she is not the natural child of the family, and, therefore, there was no law permitting the mutilation of her body against her will. Other scenes in the hospital are displayed, with sterilization operations in progress. The judge exercising this extraordinary power over the persons of others and passing sentence is exhibited as corrupt and venal, the court room as occupied by the obviously feeble-minded and criminal; and, again, the judge is shown discharging a frenzied, moronic, sexual pervert upon the intervention of a " senator " exerting political influence on the court.

Practically every announcement and speaking part heard and every action exhibited, except those of the wholesome love affair between the foster daughter and her *fiancé*, interpret and elucidate sterilization as a means and a method of contraception and birth control, or tend to that end. The reproduction of the species and its prevention exclude almost every other consideration. The reproductive organs are the theme and their perversion is the topic of the picture, and without reference thereto the picture would have neither plot nor substance.

The picture in question was intended to be viewed and its dialogue heard by mixed audiences of men, women and children of all degrees of mental and moral cultivation, including members of the great body of devotees and votaries of religion. And the question here is whether the representatives of the Department of Education have rejected the picture and refused the license capriciously or arbitrarily, or have done so in compliance with the law. The question of the good faith of the Commissioner is not in the case.

The public display of motion pictures in this State for pay is prohibited unless a license therefor is granted by the Department of Education, and unless it shall contain identification matter " which

such department shall prescribe." (Education Law, § 1089.) Provision is thus made to inform the public whether a given picture has met the legal and moral requirements of the law. The statute also requires that the Department shall issue a license, "unless such film or a part thereof is obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime." (§ 1082.)

The Commissioner is constituted the fact-finding agency under the statute and has been intrusted by the Legislature with the duty of determining whether or not a picture is immoral, tends to corrupt morals or to incite to crime. And it has now become academic under our law that if there is evidence to constitute a reasonable basis for the determination of the Commissioner, if his determination is not arbitrary nor capricious, if the verdict of a jury reaching the same conclusion would not be set aside as against the weight of evidence, the court is not at liberty to disturb his finding. Citations of authority for this rule might well be regarded as superfluous, but some will be mentioned later.

The petitioners rely in a special way on several cases to support their position, viz., *People* v. *Müller* (96 N. Y. 408); *People* v. *Eastman* (188 id. 478), and *People* v. *Wendling* (258 id. 451). All of these were cases of criminal prosecution under the Penal Law, and not comparable either in fact or in law. And in the *Wendling* case, most heavily relied upon, the court held only that the showing of base people on the stage, including prostitutes, and the use of coarse and profane language, was not a violation of section 1140-a of the Penal Law. The court was then at pains to say: " We do not purpose to sanction indecency on the stage by this decision or to let down the bars against immoral shows or to hold that the depiction of scenes of bawdry on the stage is to be tolerated," but that the showing of people who are not " nice " does not make an obscene play (p. 455). The *Halsey* case, cited by the petitioners, was an action for malicious prosecution, and in the main the case involved the question of probable cause and whether or not a book is salacious because it embodies a few paragraphs of that character. (*Halsey* v. *New York Society*, 234 N. Y. 1.) Again the citation is not useful because there the action was one for damages, and the rights of the parties were determined at common law and not, as here, by the terms of a statute.

As this case is not a prosecution under penal provisions nor one at common law, so a motion picture, as this court has already held, is neither a book, a newspaper nor literature, but " a spectacle or show rather than a medium of opinion and the latter quality is a mere incident to the former." And, further, in the same case,

this court said, through Hinman, J.: " Certainly there are some things which are happening in actual life today which should not have pictorial representation in such places of amusement as are regulated by this legislation, places where the audiences are not confined to men alone or women alone and where children are particularly attracted." (*Pathe Exchange, Inc.*, v. *Cobb*, 202 App. Div. 450, 456, 457.)

In that case the picture involved only " current events " and not a studied creation inherently tending to distort the minds of the unwary and of children, to teach the corruption of courts and to portray devices for circumventing the Penal Law.

The *Lord* case was a picture involving venereal diseases, and the claim was that it was educational. The opinion states that it showed persons in the nude, but to what extent or in what manner is not indicated. There this court, speaking through Whitmyer, J., said: " Here, it is not alleged and it does not appear that the examining officials acted in bad faith, or capriciously, or arbitrarily, or without reasonable grounds for apprehending that public morality, decency, or welfare would be endangered. * * * There is only a difference of opinion as to the character of the picture. That is a question of fact, the determination of which has been committed to the Education Department. There is evidence to support its determination. And it is not a case where, upon all the evidence, there was such a preponderance the other way that the verdict of a jury to the same effect * * * would be set aside by the court as against the weight of evidence," and, therefore, there was no question to review. (*Matter of Public Welfare Pictures Corp.* v. *Lord*, 224 App. Div. 311.)

In the *Bell* case the picture under consideration was entitled " Birth Control," showing particularly a widely publicized person. The Special Term enjoined the commissioner of licenses against interfering with the production. The Appellate Division unanimously reversed, despite the fact that the plaintiff proposed to exhibit the picture only to adults, saying that " The *nature of the subject* dealt with by this motion picture in itself is evidence that there is room for an honest opinion on the part of the defendant that the presentation of the photo-play will be injurious to public morality, decency and welfare. The Legislature has declared it to be against the public interests to have contraceptive information disseminated. * * * It fairly appears that the concentration of the minds of those in attendance at such a production on this question of birth control for a considerable period of time — for the film is long — may engender a desire to obtain the information, of the existence of which they are thus assured, and lead to violations of the law." (*Message Photo-Play Co., Inc.*, v. *Bell*, 179 App. Div. 13, 20, 21.)

In the *Edgerton* case a license was revoked, and the County Court annulled the revocation. The Appellate Division, in reversing the County Court and denying the license, stated the policy which is in harmony with the statute, viz., " Even though the picture inculcates such a lesson, it does not necessarily follow that the exhibition may not offend against public decency. However desirable it may be to disseminate such knowledge, it may well be doubted that it should be done by means of a picture show in a public playhouse." (*Genesee Recreation Co.* v. *Edgerton*, 172 App. Div. 464, 466.)

" Tomorrow's Children " publicizes and elucidates sterilization as a means to prevent the conception of children, that it is a form of birth control, contraception without penalty, and that it is " an immoral means to a desirable end." It declares its own immorality. It tends to inculcate the fact that venal judges in court dispense injustice and that young girls may be mutilated, unlawfully, but under the forms of law, when accident does not prevent. It demonstrates the manner how and the ease with which the law may be violated. The content of the picture is devoted to an illegal practice which is, as a matter of common knowledge, immoral and reprehensible according to the standards of a very large part of the citizenry of the State.

Many things may be necessary in surgery which are not proper subjects for the movies. The teaching and demonstration of many facts may be necessary to the classroom of the law school, the medical school and clinic, the research laboratory, the doctor's office, and even the theological school, which are not proper *subject-matter* for the screen. This court, speaking through RHODES, J., recently upheld the Commissioner of Education in his refusal to grant a license for a picture on the ground that the picture " unduly emphasizes the carnal side of the sex relationship." (*Matter of Eureka Productions, Inc.*, v. *Byrne*, 252 App. Div. 355.)

The law of New York prohibits the dissemination of any written advertisement, circular or notice, of any kind of a recipe to prevent conception, and prescribes that one who thus offends is guilty of crime. (Penal Law, § 1142.) It is our view that a public presentation of the picture " Tomorrow's Children " is a clear violation of that provision. The Commissioner of Education is intrusted by the State with the education of its children, which necessarily involves obedience to law; and by the statute in question he is also charged with the duty of protecting their morals in keeping with the moral standards of the people of this State. His action in rejecting this picture and in refusing a license in this case we regard as neither capricious nor arbitrary, but a proper exercise of the office with which he is clothed.

The determination should be confirmed, with costs against the petitioners.

CRAPSER and BLISS, JJ., concur; HILL, P. J., and HEFFERNAN, J., dissent in an opinion by HILL, P. J., in which HEFFERNAN, J., concurs.

HILL, P. J. (dissenting). This is a proceeding under article 78 of the Civil Practice Act to review the determination of the State Commissioner of Education denying a license to exhibit the film "Tomorrow's Children." The picture is a forceful and dramatic argument against the enactment of statutes which, under certain circumstances, permit enforced operations to prevent procreation. Several of the States have such statutes. One was enacted in this State (Laws of 1912, chap. 445), which created a Board with power to determine whether the mental condition of any of "the feeble-minded, epileptic, criminal and other defective inmates confined in the several State hospitals for the insane, State prisons, reformatories and charitable and penal institutions" would be substantially improved by such an operation and whether their children would be likely to inherit a tendency to crime, insanity, feeble-mindedness, idiocy or imbecility, and giving the Board power to require such an operation upon an affirmative determination of either of the foregoing inquiries. Our statute required that the Board, preliminary to making its determination, examine into the mental and physical condition and the record and former history of the patient. The statute was repealed, effective May 10, 1920. (Laws of 1920, chap. 619.) Thus the film deals with a disputatious subject of public concern.

The Commissioner of Education may refuse a license upon any or all of the following grounds: That a film is (1) obscene, (2) indecent, (3) immoral, (4) inhuman, (5) sacrilegious, (6) of such a character that its exhibition would tend to corrupt morals, (7) incite to crime. No findings of fact were made by the Commissioner, but he stated the following conclusion: "I have come to the conclusion that said picture is 'Immoral,' 'Will Tend to Corrupt Morals' and 'Will Tend to Incite to Crime.'" *Expressio unius est exclusio alterius*. The Commissioner has found that the film was not obscene, indecent, inhuman or sacrilegious. The portion of the decision which deals with immorality offends against the requirement that findings of fact be made. The petitioners were entitled to an opportunity to challenge the undisclosed findings of fact which the Commissioner made in support of his conclusion. The meaning of "immoral," particularly in view of the exclusion

of " obscene " and " indecent " is uncertain. Immoral and moral are words which in a general sense deal with social, civic and religious conduct. Immoral is defined by Webster as " Not moral; inconsistent with rectitude, purity, or good morals; contrary to conscience or the moral law; wicked; unjust; vicious; licentious; " also as the opposite of moral, which is defined as being " Characterized by practical excellence, designating, or relating to, the science or philosophy of conduct; hence, relating to, or regarded with respect to, the qualities and consideration, with which morals deal, as questions of right and wrong or virtue and vice; the dictates of the moral sense; moral conduct; — distinguished from immoral, and sometimes, in reference to merely social righteousness, from religious." It is hardly to be assumed that the Legislature used the word " immoral " in the broad sense of the definition. The word as used in statutes of this kind has to do with the " standards of right and wrong, specifically as to the sexual relation." (*People* v. *Wendling*, 258 N. Y. 451, 453; *Halsey* v. *New York Society*, 234 id. 1; *People* v. *Eastman*, 188 id. 478.) The film contains nothing lewd or lustful. No part of the human body is exposed to view with the possible exception of a few square inches of the abdomen visible in the preparation for an operation. It would require a prurient imagination to find anything of the unchaste or indecent. The determination should be annulled for failure to find facts and the matter remitted. (*Matter of Elite Dairy Products* v. *Ten Eyck*, 271 N. Y. 488, 498.)

The attorney for the Commissioner of Education charges immorality because " Throughout the picture the minds of the audience are centered upon the subject of sterilization of human beings, curiosity is aroused as to the operation on the sex organs and the effect of sterilization, and the audiences await the picturization of the operation that is performed on the young criminal and that is about to be performed on the sex organs of the young girl." Assuming this statement to be true, and considering the matter on the merits, it does not make the film immoral. " A history of prostitution or of sexual life is not *per se* indecent although such a book might easily be so written as to offend decency." (*People* v. *Wendling, supra*, p. 455.) Censorship statutes may not regulate manners. (*People* v. *Eastman, supra*.) There were no facts before the Commissioner upon which he could base a finding of immorality or that the film tended to corrupt morals.

It is argued that the film incites to the commission of the crime forbidden by section 1142 of the Penal Law which deals with the dissemination of information concerning contraception. The theme of the film no more suggests sterilization as a means of

birth control than a film showing the amputation of a leg would suggest that as a means to prevent persons from walking into danger.

It is further argued that the subject of sterilization should not be given publicity. Such an argument presents the issue of whether our people may govern themselves or be governed; whether arguments for and against proposed and impending legislation may be presented direct in the public prints, on the stage and by films, or whether a Commission or Commissioner is to determine the limit and character of the information to be given to the public. Ministers of propaganda are favored in certain jurisdictions, but agencies of that kind have never been approved here. In *Halsey* v. *New York Society* (*supra*) Judge ANDREWS, for a majority of the court, says (p. 6): " The conflict among the members of this court itself points a finger at the dangers of a censorship entrusted to men of one profession, of like education and similar surroundings. Far better than we, is a jury drawn from those of varied experiences, engaged in various occupations, in close touch with the currents of public feeling."

The court scene is criticized. Neither the decision nor the brief states whether the objectionableness arises because of immorality, danger to morals or as inciting to crime. The scene is comparable with a city magistrate's court. The cases are dealt with summarily. One whose sterilization had been directed by the board of sterilizers and who did not consider this " desirable " appeared before the court personally and with a politically important " senator " as his counsel. The judge is shown to yield obsequiously to the senator's importunities while arbitrarily denying the prayers of the unrepresented suitors. Merited and unmerited criticism is permitted against all who hold public office. It is deemed necessary and wise under our concept of freedom of speech and of the press. The judiciary, no more than the executive and legislative, are sacrosanct. The foundation and fame of our judicial system is not so unstable as to be injured by this Police Court scene which is neither immoral, tending to injure morals or to incite to crime. It is to be hoped that no magistrate or other judicial officer ever lent a sympathetic ear to the politically powerful. If this be the fact, then the scene which makes judicial apostasy loathsome will tend to continue the past high standards. If any of the judiciary have failed to adopt Coke's reply to the King as a standard of conduct, this scene may have a corrective effect. In behalf of the magistrate; the scene shows him active to correct an error when information was received that a mistake was made. This is praiseworthy.

The decision should be annulled and the matter remitted to the Commissioner with directions to issue the license.

HEFFERNAN, J., concurs.

Determination confirmed, with fifty dollars costs and disbursements.