In the Matter of JOSEPH BURSTYN, INC., Appellant, against LEWIS A. WILSON, as Commissioner of Education of the State of New York, et al., Respondents.

Argued June 1, 1951; decided October 18, 1951.

*Ephraim S. London, Clendon H. Lee, Leonard P. Simpson* and *Seymour M. Burg* for appellant. I. The Regents have no power to revoke a film license or to review the motion picture division's action in granting a license. (*Cannon* v. *Towner,* 188 Misc. 955; *Matter of Cherry* v. *Board of Regents,* 289 N. Y. 148; *United States* v. *Alpers,* 338 U. S. 680.) II. Even if there were statutory authority, there was no legal justification for the revocation of the licenses for " The Miracle ". (*United Artists Corp.* v. *Amity Amusement Corp.,* 188 Misc. 146; *Matter of Reynolds* v. *Triborough Bridge & Tunnel Authority,* 276 App. Div. 388; *Matter of Mayer* v. *Byrne,* 256 App. Div. 431; *Matter*

*of D & D Realty Corp.* v. *Coster,* 277 App. Div. 668; *Matter of New York State Employees' Retirement System* v. *Board of Supervisors,* 157 Misc. 87, 251 App. Div. 198, 278 N. Y. 496; *Matter of Bohrer* v. *Coster,* 195 Misc. 274; *Matter of Hall* v. *Walsh,* 137 Misc. 448, 221 App. Div. 756; *Matter of Translux Brooklyn Theaters Corp.,* N. Y. L. J., Dec. 19, 1934, p. 2473, col. 12; *Butterworth* v. *United States ex rel. Hoe,* 112 U. S. 50; *Matter of L'Hommedieu* v. *Board of Regents,* 276 App. Div. 494.) III. The censorship law as construed by the Regents violates the constitutional guarantees of religious liberty and the separation of Church and State. (*Illinois ex rel. McCollum* v. *Board of Educ.,* 333 U. S. 203; *Everson* v. *Board of Educ.,* 330 U. S. 1; *West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624; *Cantwell* v. *Connecticut,* 310 U. S. 296.) IV. The law under which the Regents acted imposes an unconstitutional restraint on freedom of expression and communication. (*Grosjean* v. *American Press Co.,* 297 U. S. 233; *De Jonge* v. *Oregon,* 299 U. S. 353; *Herndon* v. *Lowry,* 301 U. S. 242; *Lovell* v. *City of Griffin,* 303 U. S. 444; *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131; *Saia* v. *New York,* 334 U. S. 558; *Kovacs* v. *Cooper,* 336 U. S. 77; *McCulloch* v. *Maryland,* 4 Wheat. [U. S.] 316; *Mutual Film Corp.* v. *Industrial Comm. of Ohio,* 236 U. S. 230; *Gitlow* v. *New York,* 268 U. S. 652; *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697; *Thomas* v. *Collins,* 323 U. S. 516; *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146; *Winters* v. *New York,* 333 U. S. 507; *Dumont Laboratories* v. *Carroll,* 184 F. 2d 153; *Perkins* v. *Endicott Johnson Corp.,* 128 F. 2d 208.)

*Newell G. Alford, Jr., Osmond K. Fraenkel, Herbert Monte Levy* and *Robert Markewich* for New York City Civil Liberties Committee and another, *amici curiæ,* in support of appellant's position. I. The Board of Regents has no power express or implied to revoke the license granted by its motion picture division. II. To serve the ends of the First Amendment, motion pictures must receive its protection. Even if movies were mere entertainment, they would still be protected by the First Amendment. But they are not now mere entertainment. (*Mutual Film Corp.* v. *Industrial Comm. of Ohio,* 236 U. S. 230; *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146; *Winters* v. *New York,* 333 U. S. 507.)

III. Only after the *Mutual Film Corp.* case was it held that the First Amendment, via the Fourteenth, protects speech from State action. (*Bridges* v. *California,* 314 U. S. 252.) IV. The New York State censorship law establishes a previous administrative restraint, the form of restraint which inevitably and most completely violates the freedom of the press. (*Leach* v. *Carlile,* 258 U. S. 138; *Largent* v. *Texas,* 318 U. S. 418; *American Communications Assn.* v. *Douds,* 339 U. S. 382.) V. Revocation or denial of a license for a film on a finding that it is sacrilegious is a violation of the First and Fourteenth Amendments to the United States Constitution. The standard of sacrilege is void for vagueness. (*Connally* v. *General Constr. Co.,* 269 U. S. 385; *United States* v. *Cohen Grocery Co.,* 255 U. S. 81; *Jordan* v. *De George,* 341 U. S. 223; *Kunz* v. *New York,* 340 U. S. 290; *Standard Chemicals & Metals Corp.* v. *Waugh Chemical Corp.,* 231 N. Y. 51.) VI. A statutory ban on sacrilege is void as an establishment of religion. (*Everson* v. *Board of Educ.,* 330 U. S. 1; *Regina* v. *Ramsay & Foote,* 15 Cox C. C. 231; *Regina* v. *Bradlaugh,* 15 Cox C. C. 217; *Commonwealth* v. *Kneeland,* 37 Mass. 206; *People* v. *Ruggles,* 8 Johns. 290; *State* v. *Chandler,* 2 Harr. [Del.] 553; *Oney* v. *Oklahoma City,* 120 F. 2d 861; *Lynch* v. *City of Muskogee,* 47 F. Supp. 589; *Terminiello* v. *Chicago,* 337 U. S. 1; *West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624.)

*Herman Seid* for Metropolitan Committee for Religious Liberty, *amicus curiæ,* in support of appellant's position. I. The First Amendment covers freedom of expression not limited to vocal speech and the printed word. II. The constitutional principle of separation of Church and State has been violated by the Regents' cancellation of the license for the motion picture " The Miracle ". III. " Sacrilege " has no status under the Constitution. IV. No religious group is entitled to bar a film on the ground of sacrilege.

*Emanuel Redfield* for New York Chapter, Artists Equity Association, *amicus curiæ,* in support of appellant's position. I. The revocation of the license on the ground the film was sacrilegious is unconstitutional. (*Winters* v. *New York,* 333 U. S. 507; *Panama Refining Co.* v. *Ryan,* 293 U. S. 388; *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495.) II. To revoke

the license on a new construction is a denial of due process. (*Lanzetta* v. *New Jersey,* 306 U. S. 451.) III. The motion picture licensing provisions are unconstitutional as an invasion of the free expression of ideas. (*Mutual Film Corp.* v. *Industrial Comm. of Ohio,* 236 U. S. 230; *Gitlow* v. *New York,* 268 U. S. 652; *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697; *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146; *Thornhill* v. *Alabama,* 310 U. S. 88; *Ex parte Jackson,* 96 U. S. 727.)

*Will Maslow, Leo Pfeffer, Joseph B. Robison* and *Philip Baum* for American Jewish Congress, *amicus curiæ,* in support of appellant's position. I. The rationale and effect of section 122 of the Education Law is to aid and assist in an establishment of religion contrary to the mandate of the First and Fourteenth Amendments. (*Davis* v. *Gardiner,* 4 Coke 16b; *Bury* v. *Chappel,* Gouldsb. 135; *Ireland* v. *Smith,* 1 Br. & Gold. 12; *Palmer* v. *Thorpe,* 4 Coke 28; *Specot's Case,* 5 Coke 57b; *Nicholson* v. *Lyne,* Cro. Eliz. 94; *Halwood* v. *Hopkins,* Cro. Eliz. 787.) II. Section 122 of the Education Law requiring the State to pass upon religious views and penalize those found " sacrilegious " involves the State in religious affairs and restricts religious liberty in contravention of the First and Fourteenth Amendments. (*Davis* v. *Beason,* 133 U. S. 333; *Reynolds* v. *United States,* 98 U. S. 145; *United States* v. *Ballard,* 322 U. S. 78; *Watson* v. *Jones,* 80 U. S. 679; *West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568; *Panama Refining Co.* v. *Ryan,* 293 U. S. 388; *United States* v. *Dettra Flag Co.,* 86 F. Supp. 84.)

*Charles A. Brind, Jr., John P. Jehu, Elizabeth M. Eastman* and *George B. Farrington* for respondents. I. " The Miracle " is sacrilegious per se; it may not be legally exhibited in the State; the Regents not only have the power but it is their duty to revoke the license. (*Hughes Tool Co.* v. *Fielding,* 188 Misc. 947, 272 App. Div. 1048, 297 N. Y. 1024; *Matter of D & D Realty Corp.* v. *Coster,* 277 App. Div. 668; *Matter of Equitable Trust Co.* v. *Hamilton,* 226 N. Y. 241; *Matter of Walker* v. *Board of Regents,* 269 N. Y. 418; *Matter of McInerney* v. *Valentine,* 181 Misc. 1062; *Matter of Katz* v. *Goldwater,* 260 App. Div. 495, 285 N. Y. 830; *Matter of Stanton* v. *Municipal Civil Service Comm.,* 189 Misc. 782; *Matter of Lanza* v. *Ryan,* 228 App. Div. 632, 253

N. Y. 581; *Matter of O'Brien* v. *Delaney*, 255 App. Div. 385, 280 N. Y. 697; *People ex rel. Finnegan* v. *McBride*, 226 N. Y. 252.) II. The motion picture law of New York State does not violate either the State or United States Constitution. (*Pathe Exch., Inc.*, v. *Cobb*, 202 App. Div. 450; *Mutual Film Corp.* v. *Industrial Comm. of Ohio*, 236 U. S. 230; *Mutual Film Co.* v. *Industrial Comm. of Ohio*, 236 U. S. 247; *Mutual Film Corp.* v. *Hodges*, 236 U. S. 248; *RD-DR Corp.* v. *Smith*, 183 F. 2d 562, 340 U. S. 853; *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131; *Kovacs* v. *Cooper*, 336 U. S. 77; *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288; *Great Falls Mfg. Co.* v. *Attorney General*, 124 U. S. 581; *Wall* v. *Parrott Silver & Copper Co.*, 244 U. S. 407; *St. Louis Malleable Casting Co.* v. *Prendergast Constr. Co.*, 260 U. S. 469; *United States* v. *San Francisco*, 310 U. S. 16; *Fahey* v. *Mallonee*, 332 U. S. 245.) III. Neither section 122 of the Education Law nor the action taken by the Board of Regents in the case at bar constitute an infringement upon religious liberty. (*Fox Film Corp.* v. *Trumbull*, 7 F. 2d 715, 269 U. S. 597; *Cantwell* v. *Connecticut*, 310 U. S. 296; *Updegraph* v. *Commonwealth*, 11 Serg. & Raw. [Pa.] 394; *Vidal* v. *Girard's Executors*, 2 How. [U. S.] 127; *People* v. *Ruggles*, 8 Johns. 290; *State* v. *Chandler*, 2 Del. 553; *Commonwealth* v. *Kneeland*, 20 Pick. [Mass.] 206; *Zeisweiss* v. *James*, 63 Pa. 465; *Church of Holy Trinity* v. *United States*, 143 U. S. 457.)

*Patrick C. Dugan, Charles J. Tobin, Edmond B. Butler, Porter R. Chandler* and *George A. Timone* for New York State Catholic Welfare Committee, *amicus curiæ*, in support of respondents' position. I. The Appellate Division correctly held that there was a reasonable basis for the decision of the Regents that " The Miracle " is sacrilegious. II. The Appellate Division correctly held that unless the action of the Regents was arbitrary or capricious, it had no power to override their findings. (*Matter of Foy Productions, Ltd.*, v. *Graves*, 253 App. Div. 475, 278 N. Y. 498; *Matter of Public Welfare Pictures Corp.* v. *Lord*, 224 App. Div. 311; *Matter of Distinguished Films* v. *Stoddard*, 271 App. Div. 715, 272 App. Div. 842.) III. The Appellate Division correctly held that the Regents have the power to cancel a license granted contrary to law by their own subordinates. (*Pathe*

*Exch., Inc.,* v. *Cobb,* 202 App. Div. 450, 236 N. Y. 539; *People* v. *Ahearn,* 196 N. Y. 221; *Matter of Walker* v. *Board of Regents,* 269 N. Y. 418; *Matter of O'Brien* v. *Delaney,* 255 App. Div. 385, 280 N. Y. 697; *Matter of Stanton* v. *Municipal Civil Service Comm.,* 189 Misc. 782; *Matter of McInerney* v. *Valentine,* 181 Misc. 1062; *Matter of Ottinger* v. *Voorhis,* 241 N. Y. 49.) IV. There is no substance to the claim that the licensing of motion pictures is an unconstitutional restraint on free speech. (*Mutual Film Corp.* v. *Industrial Comm. of Ohio,* 236 U. S. 230; *Eureka Productions, Inc.,* v. *Lehman,* 304 U. S. 541.) V. There is likewise no substance to the claim that the denial of a license to " The Miracle " is an unconstitutional interference with freedom of religion. (*State* v. *Mockus,* 120 Me. 84; *Cox* v. *New Hampshire,* 312 U. S. 569.) VI. In any event appellant is estopped to attack the constitutionality of the statute. (*Fahey* v. *Mallonee,* 332 U. S. 245.)

FROESSEL, J. A license for the exhibition of a motion picture film entitled " The Miracle " together with two other films, described in their combination as a trilogy and called " Ways of Love ", was issued to petitioner on November 30, 1950, by the Motion Picture Division of the Department of Education of the State of New York, under the governing statute (Education Law, art. 3, part II). " The Miracle " was produced in Italy as " Il Miracolo ", and English subtitles were later added. A prior license had been issued to the original owner of the distribution rights for exhibition, with Italian subtitles alone, but the film was never shown under that license.

The first public exhibition of " The Miracle " as part of the trilogy, " Ways of Love ", was shown in New York City on December 12, 1950. It provoked an immediate and substantial public controversy, and the Education Department was fairly flooded with protests against its exhibition. Others expressed a contrary view. In consequence thereof, the Board of Regents of the University of the State of New York (hereinafter called the Regents) proceeded promptly to review the action of its motion picture division. It appointed a subcommittee, and directed a hearing requiring petitioner to show cause why the licenses should not be rescinded and cancelled.

After viewing the film and giving petitioner an opportunity to be heard, its subcommittee reported that there was basis for the claim that the picture is sacrilegious, and recommended that the Regents view the film. Petitioner declined to participate in the hearing other than to appear specially before the subcommittee for the purpose of challenging the jurisdiction of the Regents to cancel the licenses, but its sole stockholder, Joseph Burstyn, appeared as an individual and filed a brief.

Thereupon and on February 16, 1951, after reviewing the picture and the entire record, the Regents unanimously adopted a resolution rescinding and canceling the licenses upon their determination that '' The Miracle '' is sacrilegious, and not entitled to a license under the law.* Thereafter petitioner instituted the present article 78 proceeding to review that determination, and now urges that (1) the Regents were powerless to review the action of its motion picture division or to revoke the licenses; (2) the word '' sacrilegious '' does not provide a sufficiently definite standard for action; (3) the Regents exceeded their authority; (4) the statute is unconstitutional as in violation of the First and Fourteenth Amendments of the Constitution of the United States in that denial or revocation of a license on account of sacrilege interferes with religious liberty and breaches the wall between Church and State; and (5) the statute is unconstitutional *in toto* as a prior restraint on the right of free speech guaranteed by the First and Fourteenth Amendments of the Federal Constitution. The Appellate Division unanimously confirmed the determination of the Regents.

*First:* The principal argument advanced by petitioner is directed toward the claim that the Regents have no power under the statute to rescind a license once issued by the motion picture division, unless upon a charge of fraud in the procurement thereof or subsequent misconduct by the licensee. Any other construction of the statute, it is said, would be inequitable·to petitioner, which has spent money relying upon the license as issued. The Regents, on the other hand, contend that they were empowered under the Education Law and our State Constitution to make the determination here challenged.

---

* Education Law, § 122.

This issue, then, is one primarily of statutory construction, turning upon the intention of the Legislature as found in the language of the statutes. It is resolved by the answer to the question: Did the Legislature intend that the granting of a license by a subordinate official of the State Education Department should be a determination final and irrevocable, binding on the head of his department, the courts and the public for all time? As we said in *Matter of Equitable Trust Co.* v. *Hamilton* (226 N. Y. 241, 245) " That is in every case a question dependent for its answer upon the scheme of the statute by which power is conferred."

In considering the statute pattern conferring the power, we should note the framework of fact and circumstance in which the statutes are to be examined, and particularly the nature of the problem with which we are dealing. Motion pictures, by their very nature, present a unique problem. They are primarily entertainment, rather than the expression of ideas, and are engaged in for profit (*Mutual Film Corp.* v. *Industrial Comm. of Ohio*, 236 U. S. 230; *Mutual Film Co.* v. *Industrial Comm. of Ohio*, 236 U. S. 247; *Mutual Film Corp.* v. *Hodges*, 236 U. S. 248). They have universal appeal to literate and illiterate, young and old, of all classes. They may exercise influence for good, but their potentiality for evil, especially among the young, is boundless. As was said in *Pathe Exch., Inc.,* v. *Cobb* (202 App. Div. 450, 457, affd. 236 N. Y. 539), where we sustained the original statute (L. 1921, ch. 715) creating the "motion picture commission " in respect to current events films: " many would cast discretion and self-control to the winds, without restraint, social or moral. There are those who would give unrestrained rein to passion. * * * They appreciate the business advantage of depicting the evil and voluptuous thing with the poisonous charm." A public showing of an obscene, indecent, immoral or sacrilegious film may do incalculable harm, and the State, in making provision against the threat of such harm (Education Law, § 122), may afford protection as broad as the danger presented.

We are thus concerned with a valid exercise of the police power (*Mutual Film* cases, *supra*; Note 64 A. L. R. 505, and cases therein cited; *Pathe Exch., Inc.,* v. *Cobb, supra*) and with rights acquired by licensees thereunder. Such rights are not

contractual in the constitutional sense (*People ex rel. Lodes* v. *Department of Health,* 189 N. Y. 187; 12 Am. Jur., Constitutional Law, § 405; 33 Am. Jur., Licenses, §§ 21, 65). This is the general rule notwithstanding the expenditure of money by a licensee in reliance upon the license, although there is authority to the contrary in the case of building permits (33 Am. Jur., Licenses, § 21; *People ex rel. Lodes* v. *Department of Health, supra,* distinguishing at p. 196, *City of Buffalo* v. *Chadeayne,* 134 N. Y. 163). Moreover, rights gained under the statute are accepted with whatever conditions or reservations the statute may attach to them. With these precepts in mind, and in the light of the problem with which the Legislature dealt, we may properly turn to a consideration of the statutory scheme.

The original body for the licensing of motion pictures for exhibition in this State was an independent commission created by chapter 715 of the Laws of 1921, its members appointed by the Governor, by and with the advice and consent of the Senate. While the provisions for licensing were similar to those now in the Education Law, there was an essential difference in the scheme embodied therein due to the *independent* nature of the former commission, which was then expressly given all of the powers now granted to the Regents. In 1926, the functions of the motion picture commission were transferred to the Department of Education and the old commission was abolished (L. 1926, ch. 544; State Departments Law, § 312). In 1927, the present form of the statute was incorporated into the Education Law as article 43 thereof (L. 1927, ch. 153, §§ 28, 29). These changes were significant, as will presently more fully appear.

The Regents are a constitutional body, existing since 1784 (N. Y. Const., art. XI, § 2). They are named as head of the Education Department in the same paragraph as are the three chief elective officers of the State, the Governor, Comptroller and Attorney-General (art. V, § 4). The latter provision of our Constitution empowers the Regents to "appoint and at pleasure remove a commissioner of education to be the chief administrative officer of the department." The mere placing of the motion picture commission in the Department of Education indicates an intention that the Regents should henceforth exercise complete authority over that agency.

Moreover, by explicit language, the Legislature gave to the Regents as head of the Education Department all of the broad powers of control and supervision formerly possessed by the independent commission, leaving to the motion picture division only " the administrative work " of licensing (Education Law, §§ 101, 103, 132). Thus, by section 101 of the Education Law, the Education Department "is charged " with " the exercise of all the functions " of the department, and with " the performance of all " the " powers and duties " transferred from the former independent motion picture commission, " whether in terms vested in such department " or in any " *division* " thereof (emphasis supplied), and such performance is authorized " by or through " the appropriate officer or division; by the same section the Regents are continued as " the head of the department ", as prescribed in the Constitution. The Regents appoint the director, officers and employees of the motion picture division, fix their compensation, assign duties to the division, establish local offices, and " prescribe the powers and duties " (Education Law, §§ 120, 121). The " form, manner and substance " of license applications are prescribed by the Education Department, and not by the motion picture division (Education Law, § 127).

The Regents must review the *denial* of a license before an unsuccessful applicant, who is given a " right of review by the regents ", can avail himself of an article 78 proceeding (Education Law, § 124). A corresponding right of review where a license was *issued* must be deemed implicit in the broad powers of the board, rendering needless any additional language by way of express grant; when the Legislature intends to withhold the power of review from the head of a department with respect to the finding of an agency of the department, it does so by express language (Labor Law [labor relations], § 702, subd. 9; Workmen's Compensation Law, § 142, subd. 4). Finally, the Regents " have *authority* to enforce the *provisions* and *purposes* " of the statute and to make rules and regulations in " carrying out and enforcing [its] *purposes* " (Education Law, § 132; emphasis supplied). This latter provision is taken directly from the original statute (§ 15), and, although not embraced in the 1926 enactment transferring the functions of the independent motion picture commission, this precise

authority was expressly given to the Regents by the 1927 amendment (Education Law, former § 1092). The power to enforce embraces the power to correct the action of a subordinate, and one of the specific provisions and purposes of the act is that no sacrilegious films be licensed.

From all of this it is clear that the motion picture division is subject and subordinate to the Education Department and the Regents, and is not independent thereof (cf. *Butterworth* v. *United States ex rel. Hoe,* 112 U. S. 50, in which an altogether different statute pattern was involved, and where an appeal was expressly authorized from the commissioner to the court, either directly or by means of an original suit in equity). Even such functions as may now be exercised by the director of the division under the statute may be exercised by other officials upon authorization by the Regents (Education Law, §§ 120, 122). Without question, then, the statute constitutes the Regents the main-spring of the entire system therein set up. To deny them the power to correct the action of a subordinate, when the ultimate responsibility rests upon them, would be to set at naught the whole elaborate plan established by the Legislature. Such power is " essential to the exercise " of the powers expressly granted (*Lawrence Constr. Corp* v. *State of New York,* 293 N. Y. 634, 639).

If petitioner's interpretation of the Education Law were to be adopted, no review either of an administrative or supervisory nature, or through the civil or criminal courts (see Penal Law, § 1141, as amd. by L. 1950, ch. 624; *Hughes Tool Co.* v. *Fielding,* 188 Misc. 947, affd. 272 App. Div. 1048, affd. 297 N. Y. 1024), of the action of a subordinate granting a license in the first instance is provided by the Legislature. Thus the most indecent, obscene, immoral, sacrilegious or depraved presentation might be made through the medium of motion picture film, provided only there was some slip, inadvertence or mistake on the part of the reviewer, leaving his superiors, the courts, and the public generally powerless to correct the situation. It would simply mean that this statutory plan to protect the public from films forbidden to be licensed for general exhibition under section 122 rests entirely upon the judgment of one or two persons in the motion picture division, whose favorable determination in the first instance is irrevocably binding on the People of the

State of New York. Such intention on the part of the Legislature would seem to be so utterly unreasonable and out of harmony with basic public policy in these matters as to be unthinkable (*People* v. *Ahearn,* 196 N. Y. 221, 227).

On the other hand, the only reasonable view to be taken is that the Legislature deemed the Constitution and the Education Law vested in the Regents as an independent constitutional body such supervisory powers as sufficiently to protect the public interest against improper action by subordinates, and that the authority thereby granted is therefore sufficiently complete in itself to accomplish the salutary purposes envisioned therein. Once the Legislature placed the power to license in the Department of Education, the Constitution (art. V, § 4) mandated the Board of Regents as its head to exercise it, and there is no legislation even purporting to restrict them from doing so. They are authorized to employ subordinates and to function " by or through " them, but are not thereby divested of their own ultimate responsibility. The action of the motion picture division must thus be regarded as reviewable by the Regents in any case — where the license is refused, on demand of the applicant; where the license is granted, on the Regents' own motion.

Accordingly, we are of the opinion that the Regents have power to review the action of its motion picture division in granting a license to exhibit motion pictures, and rightfully exercised its jurisdiction in this case.

*Second:* To the claim that the statute delegates legislative power without adequate standards, a short answer may be made. Section 122 of the Education Law provides that a license shall be issued for the exhibition of a submitted film, " unless such film or a part thereof is obscene, indecent, immoral, inhuman, sacrilegious, or is of such character that its exhibition would tend to corrupt morals or incite to crime ". Only the word " sacrilegious " is attacked for indefiniteness. The dictionary, however, furnishes a clear definition thereof, were it necessary to seek one, as, e.g., " the act of violating or profaning anything sacred " (Funk & Wagnall's New Standard Dictionary [1937 ed.]). There is no difficulty in recognizing the limits of the criterion thus established, and the courts have had no problem either with the word " sacrilegious " or with its synonym, " profane ".

In *Mutual Film Corp.* v. *Hodges* (236 U. S. 248, *supra*), the contention that there was an invalid delegation of legislative power was rejected where the statute provided that the censor should approve such films as were found to be "moral and proper and disapprove such as are *sacrilegious,* obscene, indecent or immoral, or such as tend to corrupt the morals" (p. 257, emphasis supplied). In *Winters* v. *New York* (333 U. S. 507, 510) it is stated that publications are "subject to control if they are lewd, indecent, obscene or *profane*" (emphasis supplied). In *Chaplinsky* v. *New Hampshire* (315 U. S. 568, 571–572) Mr. Justice MURPHY declared for a unanimous court: "There are certain well-defined and narrowly limited classes of speech, the *prevention* and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the *profane*" (emphasis supplied). Indeed, Congress itself has found in the word "profane" a useful standard for both administrative and criminal sanctions against those uttering profane language or meaning by means of radio (*Dumont Laboratories* v. *Carroll,* 184 F. 2d 153, 156, certiorari denied 340 U. S. 929; U. S. Code, tit. 47, § 303, subd. [m], par. [1], cl. [D]; U. S. Code, tit. 18, § 1464; see, also, Penal Law, § 2072).

Accordingly, the claim that the word "sacrilegious" does not provide a sufficiently definite standard may be passed without further consideration, since it is without substance.

*Third:* We turn now to the contention that the Regents exceeded their powers.

Petitioner urges that, even if the board had the power, there was no justification for revocation. Of course, as the Appellate Division below, in its opinion, said (278 App. Div. 253, 260): "Under the familiar rule, applicable to all administrative proceedings, we may not interfere unless the determination made was one that no reasonable mind could reach." This rule applies to the courts and not to administrative agencies, as the Regents. (*Matter of Foy Productions, Ltd.,* v. *Graves,* 253 App. Div. 475, affd. 278 N. Y. 498.)

We have all viewed the film in question. The so-called exhibits, which are simply unsworn communications expressing personal opinions, are of little help to us. The principal basis for the charge of sacrilege is found in the picture itself; the

personalities involved, the use of scriptural passages as a background for the portrayal of the characters, and their actions, together with other portions of the script and the title of the film itself. It is featured as a " way of love ". At the very outset, we are given this definition: " ardent affection, passionate attachment, men's adoration of God, sexual passion, gratification, devotion ".

While the film in question is called " The Miracle ", no miracle is shown; on the contrary, we have the picture of a demented peasant girl meeting a complete stranger whom she addresses as " Saint Joseph ". At the very beginning of the script, reference is made to " Jesus, Joseph, Mary ". " Saint Joseph " first causes her to become intoxicated. Scriptural passages referring to the Holy Sacrament (Luke 22:19), and to the nativity of Christ (Matthew 1:20), are freely employed immediately after she states she is not well. A blackout in the film, in its association with the story, compels the inference that sexual intercourse and conception ensue. " Saint Joseph " abandons her immediately following the seduction, she is later found pregnant, and a mock religious procession is staged in her honor; she is " crowned " with an old washbasin, is thrown out by her former lover, and the picture concludes with a realistic portrayal of her labor pains and the birth in a church courtyard of her child, whom she addresses as " my blessed son ", " My holy son ".

Christ is the heart and core of the Christian faith. Two personalities most closely related to Him in life were His mother, Mary, and Joseph. They are deeply revered by all Christians. Countless millions over the centuries have regarded their relationship as sacred, and so do millions living today. " The Miracle " not only encroaches upon this sacred relationship and the Biblical presentation thereof in respect to the birth of Christ, but utterly destroys it, associating it, as the Regents found, " with drunkenness, seduction, mockery and lewdness ", and, in the language of the script itself, with " passionate attachment * * * sexual passion " and " gratification ", as a way of love.

In the light of the foregoing, we conclude, as did the Appellate Division, (1) that we cannot say that the determination complained of " was one that no reasonable mind could reach "; and (2) that the board did not act arbitrarily or capriciously.

*Fourth:* It is further urged that a license may not be denied or revoked on the ground of sacrilege, because that would require a religious judgment on the part of the censoring authority and thus constitute an interference in religious matters by the State. In this connection, it is also urged that freedom of religion is thereby denied, since one man's sacrilege is another man's dogma, and one may thus be prevented from propagating his own religious views by means of motion pictures. The latter argument is specious when applied to motion pictures offered to the public for general exhibition as a form of entertainment, as we shall hereafter point out. Religious presentations, as ordinarily understood, as well as other educational and scientific films, are exempt (Education Law, § 123). Thus freedom of religion is not impaired in the slightest, as anyone may express any religious or antireligious sentiment he chooses through a proper use of the films.

Nor is it true that the Regents must form religious judgments in order to find that a film is sacrilegious. As hereinbefore indicated, there is nothing mysterious about the standard to be applied. It is simply this: that no religion, as that word is understood by the ordinary, reasonable person, shall be treated with contempt, mockery, scorn and ridicule to the extent that it has been here, by those engaged in selling entertainment by way of motion pictures. As the court below said of the statute in question, '' All it purports to do is to bar a visual caricature of religious beliefs held sacred by one sect or another, and such a bar, in our opinion, is not a denial of religious freedom.'' (278 App. Div. 253, 258.)

Although it is claimed that the law benefits all religions and thus breaches the wall of separation between Church and State, the fact that some benefit may incidentally accrue to religion is immaterial from the constitutional point of view if the statute has for its purpose a legitimate objective within the scope of the police power of the State (*Everson* v. *Board of Educ.*, 330 U. S. 1; *Cochran* v. *Louisiana State Bd. of Educ.*, 281 U. S. 370; *Bradfield* v. *Roberts*, 175 U. S. 291; *People* v. *Friedman*, 302 N. Y. 75, appeal dismissed for want of substantial Federal question 341 U. S. 907). Cases such as *Illinois ex rel. McCollum* v. *Board of Educ.* (333 U. S. 203) and *Cantwell* v. *Connecticut* (310 U. S. 296) are not to the contrary. The former case dealt

with the use of State property for religious purposes (*Matter of Zorach* v. *Clauson,* 303 N. Y. 161), while the latter held (p. 305) that " a censorship of religion as the means of determining its right to survival is a denial of liberty protected by the " First and Fourteenth Amendments. Yet even in those cases it was recognized that the States may validly regulate the manner of expressing religious views if the regulation bears reasonable relation to the public welfare. Freedom to believe—or not to believe—is absolute; freedom to act is not. " Conduct remains subject to regulation for the protection of society " (*Cantwell* v. *Connecticut, supra,* p. 304; *American Communications Assn.* v. *Douds,* 339 U. S. 382, 393).

The statute now before us is clearly directed to the promotion of the public welfare, morals, public peace and order. These are the traditionally recognized objects of the exercise of police power. For this reason, any incidental benefit conferred upon religion is not sufficient to render this statute unconstitutional. There is here no regulation of religion, nor restriction thereof or other interference with religious beliefs except insofar as the picture itself does so, nor is there any establishment of religion or preference of religion or use of State property or funds in aid of religion. There is nothing more than a denial of the claimed right to hurl insults at the deepest and sincerest religious beliefs of others through the medium of a commercial entertainment spectacle.

We are essentially a religious nation (*Church of Holy Trinity* v. *United States,* 143 U. S. 457, 465), of which it is well to be reminded now and then, and in the *McCollum* case (*supra*) the Supreme Court paused to note that a manifestation of governmental hostility to religion or religious teachings " would be at war with our national tradition " (p. 211). The preamble to our State Constitution expresses our gratitude as a people to Almighty God for our freedom. To say that government may not intervene to protect religious beliefs from purely private or commercial attacks or persecution, whatever the underlying motive, and however skillfully accomplished, as distinguished from the assertion of conflicting beliefs, is to deny not only its power to keep the peace, but also the very right to " the free exercise " of religion, guaranteed by the First Amendment. The offering of public gratuitous insult to recognized

religious beliefs by means of commercial motion pictures is not only offensive to decency and morals, but constitutes in itself an infringement of the freedom of others to worship and believe as they choose. Insult, mockery, contempt and ridicule can be · a deadly form of persecution — often far more so than more direct forms of action. The prohibition of such conduct comes within the legitimate sphere of State action, and this State has recognized this principle, not only in the Education Law but in other respects as well (see, e.g., Penal Law, art. 186; Civil Rights Law, art. 4). We are not aware that this power has ever been even impliedly denied to the States.

This nation is a land of religious freedom; it would be strange indeed if our Constitution, intended to protect that freedom, were construed as an instrument to uphold those who publicly and sacrilegiously ridicule and lampoon the most sacred beliefs of any religious denomination to provide amusement and for commercial gain.

For the foregoing reasons, we conclude that the challenged portion of the statute in no way violates the provisions of the First Amendment of the Federal Constitution relating to religious freedom.

*Fifth:* Petitioner finally argues that the statute is unconstitutional *in toto*; that motion pictures are to be treated as the press generally, and may not be subjected to censorship or prior restraint. While it may not be heard in this respect, inasmuch as it has sought and obtained benefits under the statute, and even now seeks to retain the licenses granted (*Fahey* v. *Mallonee,* 332 U. S. 245, 255; *Shepherd* v. *Mount Vernon Trust Co.,* 269 N. Y. 234, 244–247), we shall dispose of this argument upon the merits.

The contention urged is made in the face of direct holdings to the contrary (*Mutual Film* cases, *supra*; *RD-DR Corp.* v. *Smith,* 183 F. 2d 562 [1950], certiorari denied 340 U. S. 853; *Pathe Exch., Inc.,* v. *Cobb,* 202 App. Div. 450, affd. 236 N. Y. 539, *supra*; 64 A. L. R. 505).

The rationale of these decisions is that motion pictures are primarily a form of entertainment, a spectacle or show, and not such vehicles of thought as to bring them within the press of the country. On this basis, petitioner's contention that the *Mutual Film* cases (*supra*) lack authority today, because it was not the Federal Constitution against which the statute was there

tested, is unsound, for the Ohio Constitution guarantees free speech and a free press as does the Federal Constitution. Essentially, what petitioner would have us do is to predict that the Supreme Court will overrule the *Mutual Film* cases and so disregard them here, as well as our own holding in the *Pathe Exchange* case (*supra*). But such was the position squarely taken in the *RD-DR Corp.* case (*supra*), where the same arguments were presented as are here urged, and they were unequivocally rejected.

On the same footing is the contention that technical developments have made a difference in the essential nature of motion pictures since the *Mutual Film* decisions. Such development was foreseen in the *Mutual Film* cases (see p. 242), and was realized at the time of the *RD-DR Corp.* case (p. 565), decided a year ago. We have already pointed out that scientific and educational films, among others of kindred nature, are not within the general licensing statute, and are thus not concerned with any problem that might be raised by an attempt to impose general censorship upon such films.

Some comfort is found by petitioner in a statement in *United States* v. *Paramount Pictures, Inc.* (334 U. S. 131, 166) to the effect that " moving pictures, like newspapers and radio, are included in the press ". That was an antitrust case, freedom of the press was not involved, and the statement was pure dictum. Moreover, it may be observed that when certiorari was sought in the *RD-DR Corp.* case (*supra*), it was denied by the same court; the only Justice voting to grant was the one who wrote that dictum. Were we to rely upon dictum, the concurring remarks of Mr. Justice FRANKFURTER in a subsequently decided free speech case (*Kovacs* v. *Cooper,* 336 U. S. 77, 96), would be appropriate: " Movies have created problems not presented by the circulation of books, pamphlets, or newspapers, and so the movies have been constitutionally regulated." (Citing the *Mutual Film* cases, *supra*.) However, dictum is a fragile bark in which to sail the constitutional seas.

The fact is that motion pictures do create problems not presented by other media of communication, visual or otherwise, as already indicated. It should be emphasized, however, that technical developments which increase the force of impact of motion pictures simply render the problem more acute. It does

not avail to argue that there is now greater ability of transmission, when it is precisely that ability which multiplies the dangers already inherent in the particular form of expression.

Whether motion pictures are *sui generis* or a very special classification of the press becomes a question for the academicians, once it is recognized that there is a danger presented and met by legislation appropriate to protect the public safety, yet narrow enough as not otherwise to limit freedom of expression. If there is any one proposition for which the free speech cases may be cited, from *Schenck* v. *United States* (249 U. S. 47) to *Dennis* v. *United States* (341 U. S. 494) and *Breard* v. *Alexandria* (341 U. S. 622), it is that freedom of speech is not absolute, but may be limited when the appropriate occasion arises. We are satisfied that the dangers present and foreseen at the time of the *Mutual Film* cases (*supra*) are just as real today.

The order of the Appellate Division should be affirmed, with costs.

DESMOND, J. (concurring). I concur for affirmance for these reasons:

1. It is not too clear from the statutes that the Legislature, transferring (by L. 1926, ch. 544) motion picture licensing from an independent State Motion Picture Commission to a new Motion Picture Division in the State Department of Education intended, without so saying, that the Board of Regents, as head of the Education Department, should have power to revoke a license granted by the division. However, there is general language in the statute (Education Law, § 132) empowering the Regents to enforce the licensing law, including its prohibition against the licensing of " obscene, indecent, immoral, inhuman, sacrilegious " films (Education Law, § 122), and it would be an improbable legislative intent that would leave all this solely to a division of the department, with no corrective authority available elsewhere in the State Government. It would be anomalous if the Regents, charged by the statute with enforcing the law, could not correct the errors of their subordinate body.

2. As to whether this film can be considered sacrilegious, our own jurisdiction is limited by the *Miller* v. *Kling* (291 N. Y. 65) rule which requires us to uphold the administrative body's decision if supported by substantial evidence. In other

words, if reasonable men could regard the picture as sacrilegious, then we cannot say that the Regents' ruling is wrong as matter of law. Reasonable, earnest and religious men in great numbers have said so, although other earnest religious voices express the other view. There was thus fair basis for the Regents' holding.

3. " Sacrilegious ", like " obscene " (see *Winters* v. *New York,* 333 U. S. 507), is sufficiently definite in meaning to set an enforcible standard. That men differ as to what is " sacrilegious " is beside the point — there is nothing in the world which all men everywhere agree is " obscene ", yet obscenity laws are universally enforced. Of course, some of the meanings of " sacrilegious " have no possible application to a motion picture, but, according to all the dictionaries and common English usage, the adjective has one applicable meaning, since it includes violating or profaning anything held sacred (see Oxford Dictionary, Vol. 8, pp. 18–19; Webster's New International Dictionary [2d ed.], unabridged, p. 2195; Black's Law Dictionary [deluxe ed.], p. 1574). We thus have a statutory term of broad but ascertainable meaning, and, by settled law, the administrative application thereof must be accepted by the courts " if it has ' warrant in the record ' and a reasonable basis in law " (*Matter of Mounting & Finishing Co.* v. *McGoldrick,* 294 N. Y. 104, 108; *Red Hook Cold Storage Co.* v. *Department of Labor,* 295 N. Y. 1, 9).

4. Motion pictures are, it would seem, not excluded from First Amendment coverage (*United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, 166) but, since there was a reasonable ground for holding this film " sacrilegious " (in the meaning which the Legislature must have intended for that term), the film was constitutionally " subject to control " (*Ex parte Jackson,* 96 U. S. 727, 736, cited in *Winters* v. *New York, supra,* p. 510). It fell within the " well-defined and narrowly limited classes of speech, the *prevention* and punishment of which have never been thought to raise any Constitutional problem" (*Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572 — italics mine). The *Chaplinsky* decision says that these narrowly limited classes of constitutionally preventable utterances include " the lewd and obscene, the profane, the libelous, and the insulting or ' fighting ' words — those which by their very utterance inflict injury or

tend to incite an immediate breach of the peace." That covers this case, and should dispose of any claim of violation of the First Amendment. If not, then any prior censorship at all of any motion picture is unconstitutional, and the floodgates are open.

FULD, J. (dissenting). It may lend perspective to recall that we are here concerned with a motion picture that has passed the rigid scrutiny of a numerous array of critics of undenied religiousness. There is, of course, no suggestion that "The Miracle " is a product of heathen hands. The story was written by a Roman Catholic and the picture produced, directed and acted solely by Roman Catholics. It was filmed in Italy, and first exhibited in Rome, where religious censorship exists. There, the Vatican Newspaper, *L'Osservatore Romano,* in reviewing it, alluded to the story and weighed the artistry of the production without condemning the moving picture or even intimating that there was any impropriety in its being viewed by Catholics. (See *The Commonweal,* March 23, 1951, p. 592.) And thereafter the film passed the United States Customs with no objection registered against it.

In 1949 and again in 1950, successive directors of the motion picture division of the State Education Department licensed the film for state-wide exhibition. It won the approval of the National Board of Review of Motion Pictures. It drew general acclaim from the press and was designated, as part of a trilogy, the best foreign language film of 1950 by the New York Film Critics, an association of critics of the major metropolitan newspapers. Finally, one important Roman Catholic publication, after deploring " these highly arbitrary invocations of 'a police censorship [that] must ultimately result * * * in great harm to the cause of religion as well as art," noted that the film " is not *obviously* blasphemous or obscene, either in its intention or execution " (Clancy, The Catholic as Philistine, *The Commonweal,* March 16, 1951, pp. 567–568; also, March 2, 1951, pp. 507–508, and March 23, 1951, pp. 590–592), and all Protestant clergymen who expressed themselves publicly — and they constituted a large number representing various sects — found nothing in the film either irreverent or irreligious.

However, as Judge FROESSEL reminds us, the contrary opinion also found strong voice, eventually reaching the ears of the board of regents. After viewing the film, that body revoked and rescinded the license — some two years after it had been initially granted — invoking as authority therefor section 122 of the Education Law. That statute provides that the motion picture division shall license each moving picture submitted to it unless it is " obscene, indecent, immoral, inhuman, sacrilegious, or is of such character that its exhibition would tend to corrupt morals or incite to crime ". The board of regents decided that the film is " sacrilegious," and its decision was confirmed by the Appellate Division.

Laying to one side for the moment the question as to the constitutionality of a statute which sanctions the banning of a moving picture on the ground that it is " sacrilegious," I am of opinion that the regents' action was without legislative warrant.

The controlling statute, the Education Law, is significant both for what it says and for what it leaves unsaid. In section 124, entitled " Review by regents ", the legislature expressly gave the regents power to review a determination of the motion picture division *denying* a license — but it conferred no similar power to review the division's *granting* of a license. By settled rules of construction, that deliberate omission by the legislature clearly indicates that no such authority was intended. (See, e.g., 2 Sutherland, Statutory Construction [3d ed., 1943], §§ 4915–4917.) And the more one searches the statute, the more clearly does that appear. For example, the statute expressly authorizes the regents to revoke a permit issued for the exhibition of a scientific or educational film (§ 125) and to revoke a motion picture license if it was obtained on a false application or if the licensee tampered with the film or if there is a " conviction for a crime committed by the [film's] exhibition or unlawful possession " (§ 128). But nowhere in the statute is there to be found any general grant of power to the regents to revoke a previously issued license. This omission is also to be contrasted with the further and explicit grant of such a power of revocation by the same Education Law as regards many other types of licenses issued by the Education Department. (See, e.g., § 6514 [as to doctors]; § 6613 [as to

dentists]; § 6712 [as to veterinarians]; § 6804 [as to pharmacists]; § 7108 [as to optometrists]; § 7210 [as to engineers]; § 7308 [as to architects]; § 7406 [as to certified public accountants]; § 7503 [as to shorthand reporters].) Clearly, the legislature knew how to bestow the power of revocation when that was its purpose.

Even more recent evidence of the legislature's design is at hand. In 1950, the legislature amended the Penal Law to prohibit prosecution, on the ground of obscenity, of a film licensed under the Education Law (L. 1950, ch. 624, amdg. Penal Law, § 1141). That enactment was inspired by *Hughes Tool Co.* v. *Fielding* (297 N. Y. 1024, affg. 272 App. Div. 1048, affg. 188 Misc. 947). It had there been held that such a criminal prosecution was permissible *because* the Education Law neither provided for nor allowed any direct review, by the regents or the courts, of a decision of the motion picture division issuing a license. If the legislature had disagreed with that interpretation of the Education Law — clearly indicated at Special Term (188 Misc., at p. 952) — it would undoubtedly have amended the Education Law, not the Penal Law. By depriving the state of the power to prosecute the exhibition of a moving picture once it receives a license, the legislature affirmed, as clearly as it could, that the granting of a license is an act of such implacable finality that it may not be challenged collaterally in a criminal prosecution any more than directly in a civil proceeding.

The legislative scheme so clearly expressed, the board of regents may neither rely upon its status as head of the Education Department to reverse decisions of a subordinate which are not the result of illegality, fraud or vital irregularity (see, e.g., *Butterworth* v. *Hoe*, 112 U. S. 50, 56, 64; cf. *People ex rel. Finnegan* v. *McBride*, 226 N. Y. 252, 257; *People ex rel. Chase* v. *Wemple*, 144 N. Y. 478, 482; *Matter of D & D Realty Corp.* v. *Coster*, 277 App. Div. 668) [1] nor draw from section 132 of the Education Law — which in over-all manner gives the board " authority to enforce the provisions and purposes of part two

---

1. There is no substance to the regents' claim that they were merely correcting the " illegal " action of the motion picture division in licensing a " sacrilegious " picture. Since obviously there was at least reasonable doubt as to whether the film was " sacrilegious," the decision of the motion picture division could not be condemned as " illegal."

of this article '' — an assumption of authority to '' review '' and '' revoke '' the grant of a license by the motion picture division. All that section 132 was designed to do, and all that it does, is to authorize enforcement. To construe its general language as authorizing review of the granting of a license is to stretch language beyond all permissible limits and to render superfluous and meaningless the very explicit language of section 124 permitting such review only where a license has been denied.

'' A statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration. A power not expressly granted by statute is implied only where it is ' so essential to the exercise of some power expressly conferred as plainly to appear to have been within the intention of the legislature. The implied power must be necessary, not merely convenient, and the intention of the legislature must be free from doubt.' (*Peo. ex rel. City of Olean* v. *W. N. Y. & P. T. Co.,* 214 N. Y. 526, 529.)'' (*Lawrence Constr. Corp.* v. *State of New York,* 293 N. Y. 634, 639.)

So, here, the regents' contention that they *must* have power to review and revoke in order to guard against error by the motion picture division in granting licenses, is not persuasive. The fact is that, in the twenty-five years during which the motion picture division has been in the Department of Education, the regents have never before reviewed the grant of a license or even suggested the existence of such a power. Limited as we are to a determination of what the legislature has done, the argument of alleged necessity has no weight in the face of this long-continued practical construction. For this court now to read into the statute a provision which that body chose not to write into it would constitute an uncalled-for intrusion into the sphere of the legislature. ''Freedom to construe is not freedom to amend.'' (*Sexauer & Lemke* v. *Burke & Sons Co.,* 228 N. Y. 341, 345; see, also, *Matter of O'Brien* v. *Tremaine,* 285 N. Y. 233, 238.)

Even if I were to assume, however, that the statute does confer a power to review and revoke, I would still conclude for reversal. In my view, that portion of the statute here involved must fall

before the constitutional guarantee that there be freedom of speech and press. The consistent course of decision by the Supreme Court of the United States in recent years persuades me that the early decision of *Mutual Film Corp.* v. *Industrial Comm. of Ohio* (236 U. S. 230) — urged as establishing that motion pictures are beyond the First Amendment's coverage — no longer has the force or authority claimed for it.

We are confronted in this case with censorship in its baldest form — a licensing system requiring permission in advance for the exercise of the right to disseminate ideas *via* motion pictures, and committing to the licensor a broad discretion to decide whether that right may be exercised. Insofar as the statute permits the state to censor a moving picture labelled " sacrilegious," it offends against the First and Fourteenth Amendments of the Federal Constitution, since it imposes a prior restraint — and, at that, a prior restraint of broad and undefined limits — on freedom of discussion of religious matters. And, beyond that, it may well be that it constitutes an attempt to legislate orthodoxy in matters of religious belief, contrary to the constitutional prohibition against laws " respecting an establishment of religion ". (Cf. *Everson* v. *Board of Educ.*, 330 U. S. 1, 15; *Illinois ex rel. McCollum* v. *Board of Educ.*, 333 U. S. 203, 210.)

The freedoms of the First Amendment are not, I appreciate, absolutes, but insofar as they are qualified, the qualification springs from the necessity of accommodating them to some equally pressing public need. Thus, some limited measure of restraint upon freedom of expression may be justified where the forum is the public street or the public square, where the audience may be a " captive " one, and where breaches of the peace may be imminent as the result of the use, or rather the abuse, of fighting words. (Cf. *Dennis* v. *United States*, 341 U. S. 494, 503 *et seq.; Feiner* v. *New York*, 340 U. S. 315, 319; *Niemotko* v. *Maryland*, 340 U. S. 268; *Terminiello* v. *Chicago*, 337 U. S. 1; *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572; *Cantwell* v. *Connecticut*, 310 U. S. 296, 308; *Schneider* v. *State*, 308 U. S. 147, 160.) Here, there is no " captive " audience; only those see the picture who wish to do so, and, then, only if they are willing to pay the price of admis-

sion to the theatre. Moreover, if subject matter furnishes any criterion for the exercise of a restraint, I know of no subject less proper for censorship by the state than the one here involved.

The Supreme Court has " consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." (*Kunz* v. *New York,* 340 U. S. 290, 294; see, also, *Niemotko* v. *Maryland, supra,* 340 U. S. 268; *Saia* v. *New York,* 334 U. S. 558; *Cantwell* v. *Connecticut, supra,* 310 U. S. 296; *Hague* v. *C.I.O.,* 307 U. S. 496; *Lovell* v. *City of Griffin,* 303 U. S. 444.) " The State cannot of course forbid public proselyting or religious argument merely because public officials disapprove the speaker's views. It must act in patent good faith to maintain the public peace, to assure the availability of the streets for their primary purposes of passenger and vehicular traffic, or for equally indispensable ends of modern community life." (See *Niemotko* v. *Maryland, supra,* 340 U. S. 268, 282, per FRANKFURTER, J., concurring.)

Invasion of the right of free expression must, in short, find justification in some overriding public interest, and the restricting statute must be narrowly drawn to meet an evil which the state has a substantial interest in correcting. (See *Feiner* v. *New York, supra,* 340 U. S. 315, 319; *Niemotko* v. *Maryland, supra,* 340 U. S. 268; *Winters* v. *New York,* 333 U. S. 507, 509; *Cantwell* v. *Connecticut, supra,* 310 U. S. 296, 307–308; *Thornhill* v. *Alabama,* 310 U. S. 88, 97–98, 105.) The statute before us is not one narrowly drawn to meet such a need as that of preserving the public peace or regulating public places. On the contrary, it imposes a general and pervasive restraint on freedom of discussion of religious themes in moving pictures, which cannot be justified on the basis of any substantial interest of the state. (Cf. *Kunz* v. *New York, supra,* 340 U. S. 290; *Dennis* v. *United States, supra,* 341 U. S. 494, 508–509.)

Over a century ago, the Supreme Court declared that " The law knows no heresy, and is committed to the support of no dogma ". (*Watson* v. *Jones,* 13 Wall. [U. S. ] 679, 728.) Just as clearly, it is beyond the competency of government to prescribe norms of religious conduct and belief. That follows inevitably from adherence to the principles of the First Amend-

ment. "In the realm of religious faith, and in that of political belief," it has been said (*Cantwell* v. *Connecticut, supra,* 310 U. S. 296, 310), " sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

The inherent indefinability, in its present context, of the term " sacrilege " is apparent upon the merest inquiry. At what point, it may be asked, does a search for the eternal verities, a questioning of particular religious dogma, take on the aspect of " sacrilege "? At what point does expression or portrayal of a doubt of some religious tenet become " sacrilegious "? Not even authorities or students in the field of religion will have a definitive answer, and certainly not the same answer. There are more than two hundred and fifty different religious sects in this country, with varying religious beliefs, dogmas and principles. (See *Illinois ex rel. McCollum* v. *Board of Educ., supra,* 333 U. S. 203, 227.) With this great contrariety of religious views, it has been aptly observed that one man's heresy is another's orthodoxy, one's " sacrilege," another's consecrated belief. How and where draw the line between permissible theological disputation and " sacrilege "? What is orthodox, what sacrilegious? Whose orthodoxy, to whom sacrilegious? In the very nature of things, what is " sacrilegious " will of necessity differ with the philosophy, the training, the education and the background of the particular censor of the moment; the determination whether a film is " sacrilegious " or not, must necessarily rest in the undiscoverable recesses of the official's mind.

Any possible doubt that the term is essentially vague is dispelled by a reference to the variant and inconsistent definitions ascribed to it by the board of regents and by the Appellate Division and Judge FROESSEL. '

Thus, the regents, frowning upon the dictionary definition as " technical ",[2] nevertheless assure us that " everyone knows what is meant by this term " and, by way of demonstrating that fact, proceed to define the word as describing a film which " affronts a *large segment* of the population "; offends the sensibilities by ridiculing and burlesquing anything " held sacred by the *adherents of a particular religious faith* "; is " offensive to the religious sensibilities of *any element* of society." (Italics supplied.) Indeed, any semblance of either general meaning or specific content is, I suggest, abandoned by the regents themselves when they assert that, since " anything is only sacrilegious to those persons who hold the concept sacred ", the opinions of nonbelievers are " worthless." By such reasoning, the adherents of a particular dogma become the only judges as to whether that dogma has been offended! And, if that is so, it is impossible to fathom how any governmental agency such as the board of regents, composed as it is of laymen of different faiths, could possibly discharge the function of determining whether a particular film is " sacrilegious."

Judge FROESSEL and the Appellate Division state that the statutory proscription against the " sacrilegious " is intended to bar any " visual caricature of religious beliefs held sacred by *one sect or another* " (opinion of FROESSEL, J., p. 258, italics supplied). Though Judge FROESSEL also defines " sacrilegious " in terms of " attacking " or "insulting " religious beliefs or treating them with " contempt, mockery, scorn and ridicule " — all words of ephemeral and indefinite content — the basic criterion appears to be whether the film treats a religious theme in such a manner as to offend the religious beliefs of any group of persons. If the film does have that effect, and it is " offered as a form of entertainment," it apparently falls within the statutory ban regardless of the sincerity and good faith of the producer of the film, no matter how temperate the treatment of the theme, and no matter how unlikely a public disturbance or breach of the peace.

2. A typical definition of " sacrilege " is that found in Webster's New International Dictionary (2d ed., 1948) : " the crime of stealing, misusing, violating or desecrating that which is sacred, or holy, or dedicated to sacred uses." (See, also, the New Catholic Dictionary [Vatican ed., 1929].)

The drastic nature of such a ban is highlighted by the fact that the film in question makes no direct attack on, or criticism of, any religious dogma or principle, and it is not claimed to be obscene, scurrilous, intemperate or abusive. Nor is there any evidence of any malicious purpose or intention on the part of the producers of the film to revile or even attack Catholic doctrine or dogma, and no suggestion of any reasonable likelihood of a breach of the peace resulting from the film's exhibition.[3] So broad, indeed, is the suggested criterion of " sacrilege " that it might be applied to any fair and temperate treatment of a psychological, ethical, moral or social theme with religious overtones which some group or other might find offensive to its " religious beliefs."

It is claimed that " the courts have had no problem either with the word ' sacrilegious ' or with its synonym, ' profane ' " (opinion of FROESSEL, J., supra, p. 255). The cases to which reference is made, however, involved neither the " profane " in religion nor the " sacrilegious," and the simple fact is that the Supreme Court has never had occasion to pass upon either the one term or the other. The context in which the word " profane " appears in the cases cited (*Winters* v. *New York, supra,* 333 U. S. 507, 510; *Chaplinsky* v. *New Hampshire, supra,* 315 U. S. 568, 572), as well as the authorities there relied upon (*Cantwell* v. *Connecticut, supra,* 310 U. S. 296, 309–310; Chafee, Free Speech in the United States [1941], pp. 149–150), make it evident that the term was used, not as a synonym for " sacrilegious," but as a substitute for " epithets or personal abuse ", for swear words and for the other " insulting or ' fighting ' words ", which " by their very utterance inflict injury or tend to incite an immediate breach of the peace " and " are no essential part of any exposition of ideas ". (*Chaplinsky* v. *New Hampshire, supra,* 315 U. S. 568, 572; see, also, *Cantwell* v. *Connecticut, supra,* 310 U. S. 296, 310; Chafee, *op. cit.,* p. 150.) In short, the cases cited have nothing whatsoever to do with the

3. One writer, associated with the University of Notre Dame, noted (Clancy, *op. cit., The Commonweal,* March 16, 1951, p. 567) that, while some critics have questioned its dramatic validity and others, the director's taste in his choice of theme, " No serious or responsible critic * * * has questioned the sincerity or honesty " of the director's " intention in making the film, an intention abundantly moral * * *."

" profane " in religion, and the judges who sat in them were not called upon to give the slightest thought or consideration to the subject with which we are now concerned.

The shortcomings of ambiguous epithets as rigid boundaries for free expression are great enough in temporal and political matters (cf., e.g., *Winters* v. *New York, supra,* 333 U. S. 507; *Dennis* v. *United States, supra,* 341 U. S. 494; *Jordan* v. *De George,* 341 U. S. 223; *Musser* v. *Utah,* 333 U. S. 95), but they are all the greater when the epithets trench upon areas of religious belief. (See, e.g., *Kunz* v. *New York, supra,* 340 U. S. 290; *Saia* v. *New York, supra,* 334 U. S. 558, 561; *Cantwell* v. *Connecticut, supra,* 310 U. S. 296.) Indeed, the Supreme Court has gone so far as to hold that the First Amendment's guarantee forbids prior restraint of public discussion that even " ridicules " or " denounces " any form of religious belief. (See *Kunz* v. *New York, supra,* 340 U. S. 290, and see, particularly, concurring opinion of FRANKFURTER, J., reported in 340 U. S., at pp. 285–286.) In a free society " all sects and factions, as the price of their own freedom to preach their views, must suffer that freedom in others." (*Kunz* v. *New York, supra,* 340 U. S., at p. 301, per JACKSON, J., dissenting; see, also, *Murdock* v. *Pennsylvania,* 319 U. S. 105, 116.)

Were we dealing with speeches, with handbills, with newspapers or with books, there could be no doubt as to the unconstitutionality of that portion of the statute here under consideration. The constitutional guarantee of freedom of expression, however, is neither limited to the oral word uttered in the street or the public hall nor restricted to the written phrase printed in newspaper or book. It protects the transmission of ideas and beliefs, whether popular or not, whether orthodox or not. A belief does not lose its character as a belief, an idea does not become less of an idea, because, instead of being expressed by the air-borne voice, the printed word or the " still " picture, it is put forward by a " moving " picture. The First Amendment does not ask whether the medium is visual, acoustic, electronic or some yet unheard-of device. It has readily accommodated itself to other products of inventive genius, to other advances in technology, such as the radio and television. If " The Constitution deals with substance, not shadows ", if " Its inhibition was levelled at the thing, not the name " (*Cum-*

*mings* v. *State of Missouri,* 4 Wall. [U. S.] 277, 325), then, surely, its meaning and vitality are not to be conditioned upon the mechanism involved. Of course, it may well be that differences in media will give rise to different problems of accommodation of conflicting interests. (See *Kovacs* v. *Cooper,* 336 U. S. 77, 96, per FRANKFURTER, J., concurring.) But any such accommodation must necessarily be made in the light of fundamental constitutional safeguards.[4]

One reason for denying free expression to motion pictures, we are told, is that the movies are commercial. But newspapers, magazines and books are likewise commercially motivated, and that has never been an obstacle to their full protection under the First Amendment. (See, e.g., *Grosjean* v. *American Press Co.,* 297 U. S. 233.) Again, it is said, the fact that the moving picture conveys its thought or message in dramatic episodes or by means of a story or in a form that is entertaining, makes the difference. But neither novels, magazines nor comic books are made censorable because they are designed for entertainment or amusement. (See, e.g., *Winters* v. *New York, supra,* 333 U. S. 507, 510; *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146, 153.) The Supreme Court made that plain in the *Winters* case, when it declared: '' We do not accede to appellee's suggestion that the constitutional protection for a free press applies only to the exposition of ideas. The line between the informing and the entertaining is too elusive for the protection of that basic right. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine. Though we can see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature.'' (333 U. S., at p. 510.)

Whatever may have been true thirty-six years ago when the *Mutual Film* case (236 U. S. 230), was decided, there is no reason today for casting the motion picture beyond the barriers of protected expression. Learned and thoughtful

---

4. Whether, for instance, the statute (Education Law, § 122) may be sustained as valid even as a censorship measure insofar as its criterion is the narrow one of '' obscenity,'' is not before us and need not be considered. (Cf. *Chaplinsky* v. *New Hampshire, supra,* 315 U. S. 568, 572; *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697; *Ex parte. Jackson,* 96 U. S. 727, 736.)

writers so opine (see Chafee, Free Speech in the United States [1941], pp. 544 *et seq.;* Ernst, The First Freedom, p. 268; Kupferman and O'Brien, Motion Picture Censorship, 36 Cornell L. Q. 273; Note, 60 Yale L. J. 696; Note, 49 Yale L. J. 87), and the Supreme Court itself has recently so declared. (See *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, 166; see, also, *Kovacs* v. *Cooper, supra,* 336 U. S. 77, 102, per BLACK, J., dissenting.) As Chafee put it (*op. cit.,* p. 545), " In an age when ' commerce ' in the Constitution has been construed to include airplanes and electromagnetic waves, ' freedom of speech ' in the First Amendment and ' liberty ' in the Fourteenth should be similarly applied to new media for the communication of ideas and facts. Freedom of speech should not be limited to the air-borne voice, the pen, and the printing press, any more than interstate commerce is limited to stagecoaches and sailing vessels." And, wrote the Supreme Court (*United States* v. *Paramount Pictures, Inc., supra,* 334 U. S. 131, 166), " We have no doubt that moving pictures, like newspapers and radio, are included in the press whose freedom is guaranteed by the First Amendment."

Every consideration points that conclusion. The *Mutual Film* case should be relegated to its place upon the history shelf. Rendered in a day before the guarantees of the Bill of Rights were held to apply to the states, and when moving pictures were in their infancy, the decision was obviously a product of the view that motion pictures did not express or convey opinions or ideas. Today, so far have times and the films changed, some would deny protection for the opposite reason, that films are too effective in their presentation of ideas and points of view. The latter notion is as unsupportable as the other and antiquated view; that the moving picture is a most effective mass medium for spreading ideas is, of course, no reason for refusing it protection. If only ineffectual expression is shielded by the Constitution, free speech becomes a fanciful myth. Few would dispute the anomaly of a doctrine that protects as freedom of expression comic books that purvey stories and pictures of " bloodshed and lust " (see *Winters* v. *New York, supra,* 333 U. S. 507, 510), light and racy magazine reading (see *Hannegan* v. *Esquire, Inc., supra,* 327 U. S. 146, 153) and

loudspeaker harangues (see *Saia* v. *New York, supra,* 334 U. S. 558), and yet denies that same protection to the moving picture.

Sincere people of unquestioned good faith may, as in this case, find a moving picture offensive to their religious sensibilities, but that cannot justify a statute which empowers licensing officials to censor the free expression of ideas or beliefs in the field of religion. "If there is any fixed star in our constitutional constellation," the Supreme Court has said (*West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624, 642), "it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion".

The order of the Appellate Division should be reversed and the determination of the board of regents annulled.

LOUGHRAN, Ch. J., LEWIS and CONWAY, JJ., concur with FROESSEL, J.; DESMOND, J., concurs in separate opinion; FULD, J., dissents in opinion in which DYE, J., concurs.

Order affirmed. [See 304 N. Y. 718.]