LAWRENCE CONSTRUCTION CORPORATION et al., Respondents, *v.* STATE OF NEW YORK, Appellant. (Claims Nos. 24710 and 24711.)

Argued October 18, 1944; decided December 30, 1944.

*Nathaniel L. Goldstein, Attorney-General* (*Gerald J. Carey* and *Orrin G. Judd* of counsel), for appellant. I. For respondents to recover for damages to their buildings and improvements they must show that their buildings were built at the then legally established grade. (*Sauer* v. *City of New York*, 180 N. Y. 27, 206 U. S. 536; *Triest* v. *City of New York*, 193 N. Y. 525; *People ex rel. Architects' Offices, Inc.*, v. *Ormond*, 201 App. Div. 787; *People ex rel. Rothschild* v. *Muh*, 101 App. Div. 423; *Matter of Mellilo* v. *Kracke*, 261 App. Div. 631; *People ex rel. Sciarillo* v. *Hennessy*, 152 App. Div. 944, 206 N. Y. 740; *People ex rel. Weiser* v. *Tucker*, 175 App. Div. 976, 220 N. Y. 594; *People ex rel. Flaxman* v. *Hennessy*, 74 Misc. 166, 149 App. Div. 952.) II. The adoption by the Transit Commission of the final order of March 13, 1930, and the general plan accompanying said order, was the establishment of a legal grade by lawful authority within the meaning of section 951 of the Greater New York Charter (L. 1901, ch. 466, as amd.). (*Matter of McKinney* v. *McGoldrick*, 243 App. Div. 210; *People* v. *Kerr*, 27 N. Y. 188; *Matter of Mellilo* v. *Kracke*, 261 App. Div. 631.) III. The inclusion of damage to land in the measure of damage applied by the Court of Claims is incorrect. (*McCabe* v. *City of New York*, 213 N. Y. 468; *Matter of Ryan*, 291 N. Y. 376; *Queeno* v. *State*, 255 App. Div. 941.)

*Bertram Boardman* for respondents. I. The established grade of the street abutting claimants' property was legally raised after the erection of claimants' buildings and structures. (*Matter of Mayor* [*Briggs Avenue*], 84 App. Div. 312; *Matter of City of New York* [*Saratoga Avenue*], 226 N. Y. 128; *Matter of City of New York* [*Northern Blvd.*], 281 N. Y. 48.) II. The Transit Commission had not changed the legally established grade of the street at the time of the erection of the structures on claimants' property. III. The Trial Court correctly awarded damages measured by the difference in the fair market value of the claimants' property before and after the change of grade. (*Mirro* v. *State of New York*, 172 Misc. 963; *People ex rel. Crane* v. *Ormond*, 221 N. Y. 283.)

LEHMAN, Ch. J. Lawrence Construction Corporation in August, 1935, purchased a parcel of land on 80th Street in Glen-

dale, Borough of Queens, New York City, and immediately began the construction of five houses in accordance with plans, which were filed in the Department of Buildings of the City of New York, by an architect, retained by Lawrence Construction Corporation, and which were approved by the Department on September 4, 1935. These plans showed that the houses would be built in conformity with the grades of 80th Street as shown on an official map which had been adopted by the Board of Estimate and Apportionment and approved by the Mayor in 1929 and which was filed in the Topographical Bureau of the President of the Borough of Queens on March 4, 1930. The grades shown on that map were the physical grades of 80th Street.

In March, 1936, the Transit Commission began work upon the elimination of a grade crossing of the Long Island Railroad in Glendale, pursuant to the provisions of the New York City Grade Crossing Elimination Act (L. 1928, ch. 677) and pursuant to the provisions of chapter 936 of the Laws of 1935. The elimination of the grade crossing resulted in a drastic change of grade of the roadway on 80th Street. In March, 1930, more than five years before Lawrence Construction Corporation acquired the land and began the construction of houses on that land, in conformity with the grades shown on the map which had been approved by the Board of Estimate and Apportionment, the Transit Commission made an order denominated by it as " Final Order and Determination " which provides that it is " Ordered and Determined that the crossings at grade of the tracks of the Montauk Division of the Long Island Railroad Company with Cooper Avenue (Central Avenue) and Dry Harbor Road (80th Street), Glendale, in the Borough of Queens, shall be eliminated substantially in accordance with the plan revised as of March 5, 1930, admitted in evidence as Commission's Exhibit No. 16." The plan, referred to, consisted of a one-page map showing street plans and profiles of the proposed elimination and by means of such profiles it was possible to determine the drastic change of grade at each point on 80th Street which would result from the elimination of the railroad crossing at grade in accordance with the plan. The construction of the houses on 80th Street was stopped when the work of elimination began. At that time one house had been completed and the others partially completed. The owners are entitled

to damages resulting from the change of grade of the street if the houses were built and the land improved in conformity with the grade of the street " established by lawful authority " (Greater New York Charter, § 951; L. 1901, ch. 466).

The Charter provided that the official map or plan of the city " is to be deemed final and conclusive with respect to the location, width and grades of the streets shown thereon, so far as such location, width and grades have been heretofore duly adopted, except as herein otherwise provided." (§ 438.) " The board of estimate and apportionment is authorized and empowered, whenever and as often as it may deem it for the public interest so to do * * * to change the grade of existing streets shown upon such map or plan " (§ 442). " The map or plan of The City of New York * * * showing the streets and parks within The City of New York * * * shall be kept, one copy thereof in the office of the corporation counsel and one copy thereof, so far as the same shall apply to any one borough, in the office of the borough president of such borough. Whenever the map or plan of The City of New York * * * shall be changed, and whenever the grade of any street shown thereon shall be changed, the board of estimate and apportionment shall forthwith cause the maps and profiles, showing, such change in the map or plan of The City of New York, or in the grade of a street or streets shown thereon, to be certified by the secretary of said board and filed as follows: * * * one copy thereof, so far as the same shall apply to any one borough, in the office of the president of such borough." (§ 443.)

It is not disputed that the grade of 80th Street as shown on the map filed on March 4, 1930, in the office of the President of the Borough of Queens was *at that time*, the grade " established by lawful authority " pursuant to the provisions of the Greater New York Charter and that the map was " final and conclusive ". It is also undisputed that in 1935, when Lawrence Construction Corporation built upon its land, the Board of Estimate and Apportionment had not changed the grades so established and had not adopted any new map or caused to be filed any map showing changes in such grades. There can, then, be no doubt that Lawrence Construction Corporation built upon its property in conformity with the grade of 80th Street " established by lawful authority " unless prior to September 1935 the

Transit Commission, acting under authority conferred upon it by statute, changed the grade of 80th Street as shown on the official map and " established " new grades within the meaning of that term as used in section 951 of the Greater New York Charter.

Authority to change a grade shown on the official map or plan is conferred by the Greater New York Charter only upon the Board of Estimate and Apportionment. No such authority has been conferred upon the Transit Commission in express terms by any statute; but, as Judge Lewis points out, the New York City Grade Crossing Elimination Act provides that " in so far as any provision of this act is in conflict with any provision of the Greater New York charter, such provision of this act shall prevail " (§ 15) ; and we are told that, because the Act evinces a legislative intention to grant to the Commission plenary or exclusive power within the defined field, we must read into the New York City Grade Crossing Elimination Act by necessary implication a grant to the Transit Commission of authority to change the grade of a city street and to establish new grades by a grade crossing " elimination order " which in accordance with section 2, subdivision 5, of that Act, determines " the manner in which such elimination shall be made including a determination as to the alteration to be made in such crossing, its approaches, the method of crossing, the character of the structure and approaches   *   *   *."

A statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration. A power not expressly granted by statute is implied only where it is " so essential to the exercise of some power expressly conferred as plainly to appear to have been within the intention of the legislature. The implied power must be necessary, not merely convenient, and the intention of the legislature must be free from doubt." (*Peo. ex rel. City of Olean* v. *W. N. Y. & P. T. Co.*, 214 N. Y. 526, 529.) The claim of the State that *in the grant of an express power to make the " elimination order " defined in section 2 of the statute*, the Legislature intended to include an implied power to change the official map or plan of the city and to " establish " new grades

on streets shown on that map wholly fails, in our opinion, to meet that test.

Whether *such an order* of the Commission *made in 1930* " established " new grades though no work under such order was begun for six years thereafter, is the fundamental question in this case. The statute provides that *after* such an order is made and served on the railroad " plans, specifications and estimates of the cost of * * * elimination " must be prepared by the railroad and approved by the Commission before the work of elimination of a grade crossing may be begun or contracts for such work may be made. Until that time the Transit Commission is under no duty to proceed with the elimination of the crossing as determined by its " elimination order." It might rescind or disregard that order, or it might change the method of eliminating the crossing as there " determined." So far as appears in the record no further action of any kind was taken by the Commission in connection with the proposed elimination until after Lawrence Construction Corporation had begun to build upon its land in accordance with the existing grades of the street. True, at that time the owner had knowledge that the Transit Commission in 1930 made a " Final Order and Determination " that a railroad crossing 80th Street at grade " shall be eliminated *substantially* in accordance " with a plan annexed to that order and the owner was informed at that time that " radical changes in the street grade etc. are *contemplated* " in connection with the proposed elimination. (Italics throughout this opinion are ours.) Such knowledge or notice seems to us irrelevant upon this appeal. As Judge LEWIS points out, " our inquiry goes to the question—what was the lawfully established grade of 80th Street in 1935 when the buildings upon claimants' properties were erected." If the " elimination order " of 1930 " established " new grades, then, regardless of whether or not he had actual knowledge of the "elimination order," an abutting owner who thereafter builds upon his land in conformity with the superseded grade of the street as shown on the official map of the city and not in conformity with the newly " established grade," can recover no damages in the event that the elimination order is subsequently carried out and the newly " established " grade is made the physical grade of the street. On the other hand if the " elimination order " of 1930 did not " establish "

a new grade, an abutting owner who built in conformity with the existing grade of the street would, under the statute, be entitled to damages caused by subsequent change of grade, though he may have known that such a change was planned and even imminent.

In our inqury of what was the " lawfully established " grade of 80th Street in September, 1935, we should constantly keep in mind that concededly the existing grade, as shown on the map approved by the Board of Estimate and Apportionment and by the Mayor in 1929 was still the established grade unless a new grade was " established " *by the " elimination order " of 1930.* That order, we repeat, provided for the elimination of a railroad crossing at grade in " substantial " conformity with the plan annexed to the order, but *after service of the elimination order* upon the railroad corporation *the railroad corporation* is required to prepare plans, specifications and estimates of cost of such elimination which must be approved by the Commission before work on such elimination can begin or contracts for such work be made. (§ 2, subd. 6.) During all that time the Transit Commission could, if it chose, change the plan or method of such elimination — indeed, in conjunction with the railroad corporation it could change the plan even during the progress of the work. (§ 2, subd. 9.)

We may point out here that before the Transit Commission took any further official action towards carrying out its " Final Order and Determination " of March 13, 1930, the Legislature had enacted a statute (L. 1935, ch. 936) conferring new powers upon the Transit Commission which enabled it to adopt a program of grade crossing elimination to be paid for in whole or in part by Federal funds. It is, at least, doubtful whether otherwise the elimination of the railroad crossing at grade though " finally " determined and ordered by the Transit Commission in 1930 would have been carried out. The order made by the Commission on December 4, 1935, which directs that the work of eliminating the 80th Street crossing be performed, recites that " pursuant to Chapter 936 of the Laws of 1935 " it has adopted a program of grade crossing elimination including the elimination of the 80th Street crossing " to be paid for in whole or in part by the Federal funds known as the Works Program Grade Crossing Funds ", and expressly approves the plans prepared

by the railroad corporation *after* service of the " Final Order and Determination " which it is now said " established " in 1930 a new grade. of 80th Street. The plan so prepared which was approved by the order of 1935 differs, it is true, only in minor details from the plan annexed to the order of 1930 but there can be no doubt that the Transit Commission had power to approve plans prepared by the railroad differing in more important respects from the plan annexed to the order of 1930; nor can there be doubt that under the provisions of the statute the work of eliminating the grade crossing *must be performed in conformity with the grade shown on the plans prepared by the railroad company and approved by the Transit Commission in 1935* even if such grade were different from the grade which, it is said, had been established in 1930.

A legislative pronouncement that an " elimination order " of the Commission " establishes " a new grade of a street — even though the elimination order and consequent physical change of grade might never. be carried out or might be carried out in modified form — would place an owner of property abutting on the street in a parlous position, as this case strikingly illustrates. If the owner of property on 80th Street built upon his property, after the order of March, 1930, was made, in conformity with the grade shown on the plan annexed to that order, the building would be useless until the time when the change of grade shown in that plan was carried out — though perhaps that time might never come. On the other hand if the elimination of the railroad crossing at grade should thereafter be carried out in accordance with the plan annexed to the " elimination order " *or rather in accordance with plans thereafter prepared by the railroad company and approved by the Transit Commission,* the hapless owner who had meanwhile improved his land in accordance with existing grades, as shown on the official map of the city, could recover no damages. The Legislature has not in express terms provided that an order or determination of the Transit Commission, otherwise without effect until implemented by a further order. or determination, should have the immediate effect of " establishing " a new grade on the street, thus making it practically impossible for the unfortunate owner to improve his land until .the. proposed elimination of the railroad crossing at grade was actually carried out. We find

no ground for the conclusion that the Legislature intended to so provide by implication. Certainly such an intention is far from being " free from doubt."

We are told that unless the Legislature so intended, a " determination " by the Transit Commission to eliminate a railroad crossing at grade in accordance with plans approved by it might be delayed or even defeated by failure of the City to " establish " new grades in accordance with those plans. The answer to that contention is that even without any action by the City the work of elimination and of physical change of grade could proceed — just as it did proceed in this case and in other cases. So long as it remains uncertain whether the work of elimination will be performed in accordance with the method or plan adopted by the Commission in an " elimination order " pursuant to section 2, subdivision 5, of the statute and until the Commission has approved the plans, specifications and estimates of cost prepared by the railroad company, pursuant to subdivision 6 of the same statute, and is about to initiate the work, argument, certainly not without force, may be made that an owner should be free to improve his land in conformity with the existing grade of the street.

We are told, too, that the Transit Commission and the City have " as a matter of practical construction " treated the action taken by the Transit Commission in March, 1930, as the establishment of a new grade on 80th Street. This court has said that " the practical construction of a statute by those for whom the law was enacted or by public officers whose duty it is to enforce it, *acquiesced in by all for a long period of time,* is of great importance in its interpretation *in a case of serious ambiguity* ", (*Grimmer* v. *Tenement House Department*, 205 N. Y. 549). (Italics are new.) Here there is no " serious ambiguity " and no acquiescence by all in a practical construction made by a public officer. The testimony of the engineer of the Commission to which reference is made in the opinion of Judge Lewis is only that after the order of March 13, 1930, was made it was " a closed proposition, as far as the Transit Commission was concerned, with regard to the manner in which this elimination would be carried out." The same witness also testified, however, that " prior to the beginning of construction work or prior to the awarding of the contract " the Transit Commission

would have the " right to revise its plan " and the record demonstrates conclusively that in fact the Commission did not regard the matter as a " closed proposition " until by its order of December, 1935, it approved plans which the railroad corporation was required to prepare after the order of March, 1930, was made. The legend on the map adopted by the Board of Estimate in October, 1940, *four years after the claims in the case were filed and more than a year after the trial of these claims was begun,* was placed on the map by some undisclosed person and is equivocal in form. No weight could attach to such a " practical construction " even if the statute were ambiguous.

We need not now decide when a change of grade is " established by lawful authority " within section 951 of the Greater New York Charter in such a case as this, nor whether such changes are established only when shown upon the City map or upon plans prepared and submitted by the railroad and approved by the Commission, or by authorized physical establishment. It is enough to say in this case that the new grade was not established by lawful authority when the landowner built upon his land. The statute should be read and given effect as it is written and the judgment should be affirmed.

The judgment should be affirmed, with costs.

LEWIS, J. (dissenting). The Greater New York Charter contains a provision (§ 951; and see Administrative Code, § 307a–3.0) which denies the City's liability for a change in the established grade of a street — " except as herein provided ". That exception refers to the following provision, one phrase of which is important to the controversy now before us: " § 951. An abutting owner who has built upon or otherwise improved his property in conformity with the grade of any street or avenue *established by lawful authority,* and such grade is changed after such buildings or improvement have been erected * * * shall be entitled to damages for such change of grade. * * * ." (Emphasis supplied.)

The claimant Lawrence Construction Corporation owned unimproved land abutting upon 80th Street in Glendale, Long Island. In August, 1935, it retained a surveyor to " stake out " five lots upon each of which it contemplated erecting a house. In

executing that commission the surveyor inquired at the Topograhical Bureau of the Borough of Queens for data which would give the " grade detail " of 80th Street. The surveyor then learned and promptly reported to the corporate claimant's architect " that a grade crossing elimination was to take place at 80th Street on the Long Island Railroad and that * * * the grade crossing might be built within a year." Thereafter the surveyor delivered to the claimant a blue print survey upon which appeared the legend — " Note: This property begins about 130 feet south of the Long Island Railroad. A grade crossing elimination project may cause destructive changes in grade. Please investigate at the office of the Transit Commission before beginning the erection of houses." There is a finding by the Court of Claims, affirmed by the Appellate Division,— " That at the request of the corporation [claimant] dated September 4, 1935, Savacool [the surveyor] removed the said note from the survey on September 7, 1935. That the corporation made this request because it believed that temporary building money could not be borrowed if the lender saw the note." There is also evidence, incorporated in the finding, that the claimant corporation received on August 30, 1935, from the Topographical Bureau of the Borough of Queens a letter in which was the statement — " The elimination of the grade crossing at 80th Street on the Montauk Division of the Long Island Railroad has been ordered by the Transit Commission and plans have been prepared for this work by the engineers of the Railroad. It would be to your advantage to inspect those plans at the office of Mr. Selmer of the Transit Commission, 270 Madison Avenue, Manhattan, before starting to build, as radical changes in the street grades, etc. are contemplated." Despite information thus received by the corporate claimant it proceeded thereafter in 1935 to erect five houses at the then existing physical grade of 80th Street without regard for the change of that grade as to which it had been forewarned.

The project to separate the existing physical grade of 80th Street and the grade of the intersecting tracks of Long Island Railroad commenced March 10, 1936 — fifteen days after the claimants Kammerling had acquired from the corporate claimant one of the properties here involved. Upon the completion of the elimination project which brought about a radical change

in the grade of 80th Street in front of the claimant's properties, the present claims against the State were filed for alleged damages thereby sustained. Each claim is predicated upon section 951 of the Greater New York Charter which, as we have seen, permits the recovery of damages by an abutting owner for a change of street grade only in the event he has improved his property in conformity with a grade "*established by lawful authority*" and such grade is changed *after* such improvements. Liability in the first instance for property damage thus incurred is imposed by statute upon the State. (L. 1928, ch. 677, § 7.)

Accordingly, our inquiry goes to the question — what was the lawfully established grade of 80th Street in 1935 when the buildings upon claimants' properties were erected? The judgments awarded to the claimants by the Court of Claims and affirmed by the Appellate Division rest upon the ruling that no new street grade was established by lawful authority to supersede the physical grade of 80th Street with which the corporate claimant had conformed its building operations in 1935. Resisting the judgments herein the State's submission is that at the time the claimants' properties were improved in 1935 they were not conformed to a new grade which previously had been legally established by action of the Transit Commission.

As we consider the legal effectiveness of action taken by the Transit Commission, we look first to the scope of the Commission's authority. The Legislature has denominated chapter 677 of the Laws of 1928 as the "New York city grade crossing elimination act." (§ 1.) The title to that act makes clear a legislative intent thereby "to provide for the elimination of existing highway-railroad crossings at grade within the jurisdiction of the transit commission and to repeal inconsistent acts * * * and superseding certain provisions of the Greater New York Charter." The statute itself (§ 15) provides that — "Insofar as any provision of this act is in conflict with any provision of the Greater New York Charter, such provision of this act shall prevail." That the Legislature intended to give to the Transit Commission exclusive jurisdiction within the defined field is made clear by subdivision 1 of section 2 which provdes: "Notwithstanding any inconsistent provisions of article three of the railroad law or of any other law, general

or special, all existing highway-railroad crossings at grade within the jurisdiction of the transit commission shall be eliminated in the manner prescribed by this act ''. With greater particularity subdivision 5 of section 2 of the Act empowers the Commission by its order and after a hearing '' upon such notice as the commission shall deem reasonable,'' to designate the crossings to be eliminated and by such order to determine '' the manner in which such elimination shall be made including a determination as to the alteration to be made in such crossing, *its approaches,* the method of crossing, the character of the structure *and approaches,* * * *.'' (Italics supplied.) Other provisions of the statute relating to what is there designated as an '' enlarged plan '' (§ 5, subds. 5, 6) are not here involved.

There is undisputed evidence that prior to its approval of the project to eliminate the railroad grade crossing on 80th Street the Transit Commission, acting within its statutory powers and on due notice, held public hearings at which '' various people in the locality, the railroad and the city of New York and the various engineers '' attended and offered testimony bearing upon '' the best manner and way of carrying out this elimination.'' Thereafter, on March 13, 1930, the Transit Commission by '' Final Order and Determination '' directed the elimination of the Long Island Railroad grade crossing at 80th Street in the manner set forth on a general plan which showed the old grades at 80th Street and the new grades of that street adopted by the Commission as a part of the elimination. Copies of the order of March 13, 1930, with the general plan for the elimination were served on the Board of Estimate of the City of New York and on the President of the Borough of Queens and the elimination was carried out in 1936 in accord with that plan. A certified copy of the elimination plan which, with other data, defined a change in the grade of 80th Street, was filed in the Topographical Bureau of Queens and, concededly, came to the knowldge of the owner of the subject premises in 1935 prior to the improvements made thereon.

It is also noteworthy that as a matter of practical construction the action taken by the Transit Commission by its order of March 13, 1930, was treated as having established a new

grade of 80th Street. There was undisputed evidence to that effect by the Commission's engineer in charge of grade crossing elimination. There was also received in evidence as a part of the claimants' proof a map adopted October 31, 1940, by the Board of Estimate of the City of New York which bears the title "Map No. 2734 showing a change in street grades *heretofore established* on 80th Street from Furmanville Avenue to 78th Avenue in the second ward." (Italics new.) The map — which shows the street grade of 80th Street as established by the Transit Commission order of March 13, 1930 — bears the following legend: "The grades shown hereon within the area affected by the grade crossing elimination are existing grades *established pursuant to an order and determination of the Transit Commission* and the adoption of this map serves to incorporate such existing grades upon the city map." (Italics supplied.)

These considerations have led me to conclude that a new grade of 80th Street, as fixed by the Transit Commission's order of March 13, 1930, was "established by lawful authority," within the provisions of section 951 of the Greater New York Charter *before* improvements were made upon the claimants' premises. (See *People ex rel. Weiser* v. *Tucker,* 175 App. Div. 976, affd. 220 N. Y. 594; *People ex rel. Architects' Offices, Inc.,* v. *Ormond,* 201 App. Div. 787, 792, affd. 234 N. Y. 549; *Mirro* v. *State of New York,* 260 App. Div. 525, 526, affd. 285 N. Y. 678.) It follows that the State is absolved from liability under section 951 of the Greater New York Charter and Laws of 1928, chapter 677, section 7.

Accordingly, I dissent and vote to reverse the judgments and to dismiss the claims, with costs.

LOUGHRAN, RIPPEY, CONWAY, DESMOND and THACHER, JJ., concur with LEHMAN, Ch. J.; LEWIS, J., dissents in opinion.

Judgment affirmed.