In the Matter of 89 CHRISTOPHER INC., on Behalf of Itself and All Other Property Owners Similarly Situated, Appellant-Respondent, *v.* DANIEL W. JOY, as Commissioner of Rent and Housing Maintenance, Respondent-Appellant.

First Department, May 14, 1974.

*Robert S. Fougner* of counsel (*Wynne B. Stern* with him on the brief; *McLaughlin & Fougner* and *Fellner & Rovins*, attorneys), for appellant-respondent.

*William E. Rosen* of counsel (*Harry Michelson*, attorney), for respondent-appellant.

MURPHY, J.   Both petitioner and respondent appeal from a judgment entered below in an article 78 proceeding instituted by petitioner landlord (on behalf of itself and all other landlords similarly situated) to review and annul the determination of respondent Rent Commissioner denying a protest to certain sections of the City Rent, Eviction and Rehabilitation Regulations which purport to interpret the statutory requirements for eligibility for a 1974 rent increase under the current City Rent and Rehabilitation Law.

In denying virtually all of the relief sought by petitioner, the judgment below affirmed the Maximum Base Rent ("MBR") sections of the city rent regulations requiring a landlord to ceritfy that he has expended 90% of the total amount of the cost index for operation and maintenance ("O&M") established for his type of building in order to obtain a rent increase, effective January 1, 1974, pursuant to the MBR sections of the statute (§ Y 51–1.0 *et seq.* of the Administrative Code of the City of New York, as amd. by Local Laws, 1970, No. 30 of City of New York).   However, Special Term permitted petitioner to collect, effective January 1, 1974, a 7½% increase in rent for any apartment below the MBR established in 1972, despite the landlord's seeming failure to comply with the 90% O&M certification mandated by the statute, on condition that it make up the deficiency in expenditures during 1974.   Petitioner appeals from the entire judgment, except to the extent that it permits collection of a 1974 increase subject to the above condition; and respondent appeals from so much thereof as granted petitioner even limited relief.

The central issue on this appeal is the construction to be given the following statutory provision which prescribes the condi-

tions for the MBR calculation and recalculation, particularly the portion dealing with certification of expenditures.

"No new maximum rent shall be established pursuant to paragraph (3) [providing for the maximum base rents effective January 1, 1972] or (4) [requiring the establishment of maximum base rents effective January 1, 1974 and biennially thereafter] of subdivision a of this section unless not more than one hundred fifty days nor less than ninety days prior to the effective date thereof, the landlord has certified that he is maintaining all essential services required to be furnished with respect to the housing accommodations covered by such certification, and that he will continue to maintain such services so long as such new maximum rent is in effect. Each such certification filed to obtain a new maximum rent pursuant to paragraph (4) of subdivision a of this section shall be accompanied by a certification by the landlord that he has actually expended or incurred ninety percentum of the total amount of the cost index for operation and maintenance established for his type of building." (Administrative Code, § Y51–5.0, subd. g, par. [6] cl. [d].)

Examination of Local Law No. 30 of 1970 reveals that the City Council made a concerted effort to cope with the widespread problem of housing disinvestment and abandonment and to preserve the existing stock of rent-controlled apartments in New York City; and to balance the interests of both landlords and tenants. After providing for rent increases on the basis of the prior rental history of the individual apartments in a building and for increased labor costs, it introduced a new long-range system for rent control by establishing an MBR for each controlled apartment. A statutory scheme was devised, essentially, to increase the financial returns of rent-controlled buildings and allocate to each apartment its fair share of the amount the landlord required to carry the building and to realize a fair return on its value, to assure the improved maintenance and upgrading of rent-controlled buildings out of the increased income obtained through the MBR provisions and to limit the amount of annual increases to 7½% over the previously existing maximum rent.

In its initial phase, an MBR for each apartment, effective in 1972 and 1973, was to be computed. Consideration was to be given to the size and location of, and the number of rooms contained in, the housing accommodation and the computation was to be based on such factors as real estate taxes, water rates and sewer charges, a formula allowance for O&M, a

limited vacancy allowance and an 8½% return on capital value. (Administrative Code, § Y51–5.0, subd. a, par. [3].) Eligibility to collect the initial MBR increase (limited to 7½% per annum [*id.*, § Y51–5.0, subd. a, par. [5]) was conditioned upon the landlord providing timely certification in 1971 that he (a) was maintaining and would continue to maintain all essential services (*id.*, § Y51–5.0, subd. g, par. [6], cl. [d]), (b) had cleared, corrected or abated all rent-impairing violations and (c) had cleared, corrected or abated at least 80% of all other violations of a stated age (or agreed to enter into a written agreement with the city rent agency to deposit all income derived from the property into an escrow or trust account for such purpose). (*Id.*, § Y51–5.0, subd. h, par. [6].)

The statutory plan then appears to mandate the disestablishment of the 1972 MBRs and the establishment of new MBRs effective January 1, 1974 and biennially thereafter to reflect changes, if any, in the factors upon which the prior MBR was based, since it states: "The city rent agency shall establish maximum rents effective January first, nineteen hundred seventy-four and biennially thereafter by adjusting the existing maximum rent to reflect changes, if any, in the factors which determine maximum gross building rental under paragraph (3) of this subdivision." (*Id.*, § Y51–5.0, subd. a, par. [4].)

In order to be eligible for a rent increase in 1974 the landlord was required, pursuant to the same provisions referred to above, to timely file new certifications as to the maintenance of essential services and the correction of rent impairing and other housing code violations. However, and in addition to the foregoing, the last sentence of clause (d) (subd. g, par [6]) of section Y51–5.0 now became operable; and the landlord was also required to provide a certification that "he has actually expended or incurred ninety percentum of the total amount of the cost index for operation and maintenance established for his type of building."

By Amendment No. 33 to its Rent, Eviction and Rehabilitation Regulations, respondent promulgated regulations sections 24, 25 and 26 to implement Local Law No. 30. On October 4, 1973, he interpreted the statute and regulations as requiring an expenditure for the building equal to 90% of the established O&M, even if such amount had not been collected.

The premises involved herein is a 20-unit, walk-up structure which had qualified for a January 1, 1972 MBR of $21,467, predicated, *inter alia*, on an O&M of $11,269.40. Because of

the 7½% rent increase limitation, petitioner was precluded from collecting more than $14,957.52 through 1973 and would need approximately six additional 7½% annual increases to reach its 1972 MBR.

In applying for its January 1, 1974 rent increase petitioner certified that it had expended $9,108.93 for O&M. This sum was $1,033.53 less than the required expenditure of $10,142.46 (i.e., 90% of $11,269.40), but substantially in excess of the O&M actually collected.

On this appeal petitioner contends that the certification of actual expenditures requirement is inapplicable to the landlord who is merely seeking additional increases to achieve his 1972 MBR, as distinguished from the owner who applies for a biennial recalculation. Alternatively, petitioner argues that the statute should be so interpreted as to require an O&M expenditure equivalent to the MBR being collected. Thus, in the instant proceeding petitioner asserts that since it was only collecting 70% of its MBR, it should only be required to expend $7,099.72 for O&M (i.e., 90% of 70% of $11,269.40). Both sides now agree that there was no justification for the exception granted by Special Term to petitioner.

Section Y51–5.0 (subd. a, par. [4]) of the Administrative Code requires the city rent agency to adjust the existing rents, effective January 1, 1974, and biennially thereafter to reflect economic changes in the pertinent MBR components. We find no basis for an interpretation which would permit a landlord to circumvent the requirement of submitting an O&M certification, before he obtained a 1974 increase, by merely requesting a continuation of his 7½% increases until his 1972 MBR is obtained instead of seeking a recalculation. Such a construction of the statute would enable a landlord to avoid any expenditures for O&M, which clearly contravenes the legislative intent, as expressed in the report of the City Council's Committee on Housing:

"Maximum rents will be recomputed every two years as provided in the bill, rather than annually as proposed by the Administration. Furthermore, commencing on January 1, 1974, the City Rent Agency is required to examine every landlord's books and financial records once every three years to determine what his actual expenditures for operation and maintenance are, and if there are any significant deviations in actual expenditures and the cost allowance, to appropriately adjust the maximum rent. Furthermore, the Agency is required to establish maximum allowances for types of housing on the

basis of such actual costs to assure that a landlord may not overimprove or overmaintain his property at the tenant's expense. This required opening of the books and adjustment of individual rents in the event of significant deviations from the cost allowance was deemed essential by the Council to prevent the indolent landlord from obtaining the same rent for the same type of building as the conscientious landlord who was actually expending such amount.

"In order to obtain biennial increases in rent the landlord must certify that he has expended at least 90 per cent of the cost allowance collected for his type of building. Furthermore, six months before an increase is due the landlord must certify that he has corrected all of the rent impairing violations against his building and 80 per cent of all other violations or he must agree to place all income from the building in trust for such purposes in accordance with a contract he enters into with the City Rent Agency." (City Council Minutes, July 26, 1970, pp. 2998-9.)

What clearly appears, therefore, is the requirement that 1972 increases under MBR are conditioned on continued maintenance of essential services and the removal of housing violations, and that biennial increases thereafter are conditioned on such factors plus a specific standard of expenditure for O&M. Accordingly, petitioner's first argument is unsound.

However, we find merit in petitioner's second contention. Although the statute appears at first blush to leave no room for construction, we nevertheless conclude that its literal application to this petitioner, and others similarly situated, would lead to an absurd and unintended result.

The Council Committee's own report referred to the "cost allowance collected" in reference to the 90% expenditure requirement; and we do not find such phrase limited, as respondent urges, to a particular type of building.

In reaching our determination, we have not overlooked those decisions which require us to read and give effect to statutes as written (*Lawrence Constr. Corp.* v. *State of New York,* 293 N. Y. 634), to refrain from resorting to conjecture when confronted with clear and unambiguous statutory language (*Meltzer* v. *Koenigsberg,* 302 N. Y. 523) and to give due weight to administrative construction (*Matter of Howard* v. *Wyman,* 28 N Y 2d 434).

However, we are not obliged to follow literal language where to do so would thwart the obvious legislative intent and lead to unexpected and absurd results. (*Matter of Chatlos* v. *Mc-*

*Goldrick,* 302 N. Y. 380.) Our reading of the statute, in the context of the legislative intent and the over-all objective of the MBR program, persuades us that the required expenditure for O&M of a building may be reduced to reflect the ratio between the full MBR for the building and the amount of rent increases under MBR the landlord is permitted to collect. The indicated legislative concern with the landlord's physical plant was counterbalanced by a desire not to overburden his tenant. The limitation on the landlord's return requires a commensurate reduction in mandated maintenance expenditures to avoid an unreasonable and arbitrary consequence.

Accordingly, the judgment of Supreme Court, New York County (FINE, J.), entered February 27, 1974, should be reversed, on the law, without costs or disbursements, the petition granted to the extent hereinabove indicated and the matter remanded to respondent Rent Commissioner for further proceedings consistent herewith.

Settle order on notice.

NUNEZ, J. P., KUPFERMAN, MURPHY, STEUER and TILZER, JJ., concur.

Judgment, Supreme Court, New York County, entered February 27, 1974, unanimously reversed, on the law, without costs and without disbursements, the petition granted to the extent indicated in the opinion of this court and the matter remanded to respondent Rent Commissioner for further proceedings consistent herewith.

Settle order on notice.