*584 OPINION OF THE COURT
Bertram R Gelfand, S.
Upon this application petitioner seeks access to both the records of her adoption and to the sealed board of health records relative to her birth. Petitioner pursues a three-pronged attack incorporating a multitude of arguments in support of the relief being sought. Initially she contends that the provisions of section 114 of the Domestic Relations Law pertaining to the sealing, unsealing and confidentiality of adoption records are not applicable to her. As a first alternative she contends that if the statute does apply to her, the proof adduced at the hearing with reference to good cause existing sustains granting the application pursuant to statute. The final basis presented for relief is a contention that in any event, the statute sealing adoption and original birth records of adoptees is offensive to the provisions of United States and New York State Constitutions and should be declared null and void.
The adoption of petitioner was concluded by the entry of an order on March 14, 1941. Petitioner’s adoptive mother joins in the application. Her adoptive father is now deceased. Upon the facts then apparent, the request made by petitioner, upon initiation of this proceeding, that her natural parents should not be made parties and that a guardian ad litem should not be appointed for them, was granted (see Matter of Linda F. M., 92 Misc 2d 828).
The constitutionality of the statute is an issue which should be addressed only if the relief sought cannot otherwise be obtained (Broadrick v Oklahoma, 413 US 601; United States v Raines, 362 US 17; People v Heller, 33 NY2d 314; People v Epton, 19 NY2d 496). Accordingly, the other basis for relief presented by petitioner will be first considered.
It is appropriate to initially address petitioner’s contention that the statute governing the sealing of adoption records is inapplicable to her. In support of this position she alleges that this statute applies only to agency adoptions and not to private placement proceedings, such as the one in which she was adopted. The pertinent portion of section 114 of the Domestic Relations Law provides that with reference to sealed adoption records "No order for disclosure or access and inspection shall be granted except on good cause shown”. Petitioner’s position that this explicit language is not applicable to her case is based upon the fact that the quoted language is in *585 a section of the Domestic Relations Law which is part of title 2 of article 7. Title 2 is entitled "Adoptions from an authorized agency.”
The pertinent provisions of the title of the Domestic Relations Law governing private placement adoptions indicate in explicit language the total lack of validity of this argument. Title 3 of article 7 of the Domestic Relations Law bears the specific heading "Private-placement adoptions.” Subdivision 4 of section 116 of the Domestic Relations Law is part of title 3. That subdivision states that if the court having jurisdiction over the adoption is satisfied that it should be granted, "the provisions of section one hundred fourteen of title two of this article shall apply.” Accordingly, the provisions for the sealing of adoption records set forth in section 114 are by reference equally applicable to both private placement and agency adoptions.
It is further argued by petitioner that the statute governing the sealing of adoption records should be construed as not being applicable to a record where the adoptee has become an adult. The possibility of such a construction rests totally upon the language of the statute.
In addressing this issue, sensitivity must be shown to the well-established principle that separation of powers dictates that courts be limited in construing a statute to determining the intent of the Legislature in those situations where the language of the statute is either subject to more than one interpretation or is otherwise unclear. (Bright Homes v Wright, 8 NY2d 157, 161-162; Sexauer & Lemke v Burke & Sons Co., 228 NY 341; McKinney’s Cons Laws of NY, Book 1, Statutes, § 76.)
The discharge of this function does not confer upon the judicial branch of government the power, under the guise of construction, to legislate by amending, modifying, extending, or otherwise creating a statutory provision alien to the clear language of that which has been enacted by the Legislature and signed by the Governor (Matter of Anonymous [St Christopher's Home], 40 NY2d 96, 102; Matter of Malpica-Orsini, 36 NY2d 568, 571, app dsmd 423 US 1042; Bright Homes v Wright, 8 NY2d 157, supra; Allen v Minskoff, 38 NY2d 506; Lawrence Constr. Corp. v State of New York, 293 NY 634, 639; Sexauer & Lemke v Burke & Sons Co., 228 NY 341, supra).
On this subject, Judge Cardozo, speaking for a unanimous *586 Court of Appeals cautioned that: "Freedom to construe is not freedom to amend.” (Sexauer & Lemke v Burke & Sons Co., 228 NY 341, 345, supra.)
Chief Judge Lehman writing for a majority of six Judges wrote at page 639 in Lawrence Constr. Corp. v State of New York (supra): "A statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration.
More recently Judge Foster writing for a unanimous Court of Appeals strongly restated the applicable admonition in the much cited case of Bright Homes v Wright (8 NY2d 157, 162, supra) in the following language: "Courts are not supposed to legislate under the guise of interpretation, and in the long run it is better to adhere closely to this principle and leave it to the Legislature to correct evils if any exist.”
Petitioner cites no statutory language limiting the period in which an adoption record remains sealed, nor can the court discern any express or implied intent in the statutes which would support the construction sought by petitioner. A reading of all of the sections of the Domestic Relations Law applicable to both agency and private placement adoptions does not disclose any possible basis for concluding that between the lines of the explicit language constituting the statute governing the sealing of adoption records, there exists an unexpressed intent on the part of the Legislature that the provisions with reference to such sealing of adoption records are not applicable to adoptees who have reached their majority.
In interpreting adoption legislation, it must be further remembered that adoptions were unknown to the common law. Adoption is a procedure that exists only by dint of statutory enactment (Matter of Malpica-Orsini, 36 NY2d 568, 570, supra; Betz v Horr, 276 NY 83, 86-87; Carpenter v Buffalo Gen. Elec. Co., 213 NY 101, 104; Matter of MacRae, 189 NY 142, 143; Matter of Thorne, 155 NY 140, 143; Caruso v Caruso, 175 Misc 290). Since adoption statutes are in derogation of the common law, they must be strictly construed ("Doe” v "Roe”, 37 AD2d 433, 436; Caruso v Caruso, supra; Matter of Santacose, 271 App Div 11, 16; Matter of "Wood” v "Howe”, 15 Misc 2d 1048, 1050).
It is accordingly concluded that the statutes whose construe *587 tion have been placed in issue by petitioner provide that all records of adoptions are sealed forever unless opened by an order of a court of appropriate jurisdiction upon the establishment by a petitioner of good cause. The applicable statutes make no distinction between a record of a private placement or an agency adoption, nor do they differentiate between a record where the adoptee is now an adult, or one in which the adoptee is still an infant.
It having been concluded that the statute requires a showing of good cause before the records at issue can be unsealed, it is necessary to review the proof offered by petitioner to establish good cause. Petitioner, to succeed on this issue, must show a present need to view the sealed records (Matter of Chattman, 57 AD2d 618; Matter of Anonymous, 89 Misc 2d 132). This need must rise above mere desire or curiosity. A present need sufficient to sustain good cause has been found when the evidence has shown that access was necessary for a current medical or genetic reason (Matter of Chattman, supra) or for a present psychological problem (Matter of "Anonymous”, 92 Misc 2d 224; Matter of Maxtone-Graham, 90 Misc 2d 107). In each of these cases a causal connection was established between the medical support for the application and a present need of the petitioner.
The record indicates that petitioner is now approximately 37 years of age. The order of adoption was entered when she was approximately eight months old. Petitioner first learned of her adoptive status in 1971 when her adoptive father was seriously ill.
Petitioner testified that she was first married in 1960. She presently resides with her 17-year-old son who was the sole issue of that marriage and is petitioner’s only child. This marriage was terminated by divorce in December, 1961. Petitioner entered into a second marriage in November 1971, which was annulled in September, 1974.
It was further testified by petitioner that she graduated from college in 1963. She devoted the period from 1963 to 1970 exclusively to the care of her son. Thereafter she began working in the field of typesetting. She is presently employed by a law firm doing related work.
It is argued by petitioner that the knowledge of her adoptive status without the full knowledge of the identity of her natural parents has caused her psychological problems which impaired her artistic skills. In support of this argument, *588 petitioner stated that she had "cut” a musical record in 1964, the success of which was not clarified. She has not made any recording since that time. She also indicates that she wrote poetry in college, but was not inspired in this direction again until 1973.
It is also contended by petitioner that good cause exists because of petitioner’s concern that she might enter into an incestuous marriage unless she is able to learn the identity of her natural parents. A further ground for the existence of good cause was that she wished to establish the faith of her son and herself by learning the faith of her natural mother. Petitioner also testified that she had consulted a psychiatrist. However, these consultations were not related to her adoptive status. They consisted of discussions concerning her relationship with the father of her son.
At the hearing testimony was adduced from a psychologist, and from a psychiatrist whose specialty is human genetics. Neither of these witnesses ever treated petitioner. The psychologist was primarily involved with a research project involving adoptees as one phase of an inquiry called "People at Risk.” The other groups involved in addition to adoptees were prisoners and diabetics. This witness had interviewed petitioner during three one-hour sessions over a one-year period and had administered tests in connection with a control group of 300 adoptees he had under study. Petitioner’s test results placed her in the middle of the test scale. These results indicated nothing unusual about petitioner as an adoptee as against a nonadoptee.
The expert testimony of the psychiatrist was limited to indicating that genetic history is useful in the diagnosis of certain ailments. However, neither petitioner nor her son is undergoing, or has in the past undergone, any medical treatment or examination for which genetic data was needed. The testimony on genetics was in no way related to petitioner or her son, nor was it causally connected to the issue on trial.
The evidence as to petitioner’s marital history and lack of artistic achievement for a period of years was not even remotely connected to any need to view the records that are presently sealed. The attempt to relate the lack of success of her second marriage to a younger man of a different faith to her 1971 discovery of her adoptive status is not supported by the credible proof. The hiatus in petitioner’s artistic efforts began long before petitioner knew she was adopted and her *589 present renewed interest began long after she learned she was an adoptee. The proof on this subject did not in any way relate her nonproductivity in artistic areas to her adoptive status or to her learning of this status. The record is also devoid of any evidence which would support a conclusion that petitioner, or her son, harbored any religious belief which would sustain a need to unseal the records at issue.
The evidence adduced fails to even suggest, let alone sustain, any conclusion other than that the motivating cause for the application is petitioner’s curiosity. To conclude that mere curiosity as to one’s natural forebears constitutes good cause within the framework of section 114 of the Domestic Relations Law would render the clear import of the statute meaningless. Every application to unseal adoption records would have to be perfunctorily granted. This would be a result whereby judicial fiat the clear provisions of the statute would be routinely ignored. Such a course would be no less than blatant judicial intrusion into the legislative process. It is accordingly concluded that petitioner has failed to establish a statutory right to relief.
There remains petitioner’s challenge to the constitutionality of the statute that bars her access to the records she seeks to examine. Petitioner argues that section 114 of the Domestic Relations Law unconstitutionally deprives her of a fundamental right to her "personality”, "privacy”, and "to receive information about her origin”, all of which rights are allegedly "protected by the due process and equal protection clauses, as well as by the Thirteenth Amendment.” It appears that intrinsically this argument rests upon the statute precluding her from access to information as to her birth which a nonadoptee could obtain, and a conclusion that this legislatively created limitation has no legitimate basis.
A court is assessing a constitutional attack upon a statute must be sensitive to certain basic principles. It must be remembered that a strong presumption of constitutionality attaches to all legislation (Wasmuth v Allen, 14 NY2d 391, 397; Defiance Milk Prods. Co. v Du Mond, 309 NY 537; Matter of Cullum v OMara, 43 AD2d 140, 145). From this presumption flows a further presumption that the Legislature, in enacting a statute, has investigated and found the facts necessary to support a need for the legislation (I. L. F. Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269; Lincoln Bldg. Assoc. v Barr, 1 NY2d 413; Matter of Cullum v *590 O’Mara, supra; East N. Y. Sav. Bank v Hahn, 293 NY 622, affd 326 US 230). Relatively recent holdings of our highest court have indicated that a party seeking to declare a statute unconstitutional must demonstrate its invalidity beyond a reasonable doubt (People v Pagnotta, 25 NY2d 333, 337; Matter of Van Berkel v Power, 16 NY2d 37, 40).
It is not disputed that the development of a procedure which will promote, encourage and facilitate the adoption of children is a legitimate area of State concern. As in other areas of responsibility exercised by a sovereign State, it is recognized that the proper discharge of these responsibilities involves, of necessity, the enactment of statutes which submerge individual rights to the common good resulting in some restriction on the unfettered liberty of individuals or institutions to proceed as they may wish in every situation. The State is given this authority under the police powers so that it may discharge its responsibilities as a sovereign. These powers give broad discretion to the Legislature in selecting the most appropriate course for promoting and protecting the health, welfare and safety of the people of the State. The extensive nature of the State’s police power was described by the United States Supreme Court as follows in Atlantic Coast Line v Goldsboro (232 US 548, 558): "For it is settled that neither the 'contract’ clause nor the 'due process’ clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise.” Its scope was more recently summarized by the Court of Appeals as follows: "At the outset it must be emphasized that '(t)he police power of the State is the least limitable of all the powers of government’ (Matter of Engelsher v. Jacobs, 5 N Y 2d 370, 373, cert. den. 360 U. S. 902) and we have sustained its application to the conservation of fish and wildlife (Barrett v. State of New York, 220 N. Y. 423, supra) and other areas of beauty and esthetics (New York State Thruway Auth. v. Ashley Motor Ct., 10 N Y 2d 151; People v. Stover, 12 N Y 2d 462, app. dsmd. 375 U. S. 42 [for want of substantial Federal question]). In Barrett (supra, at p. 428) we said: 'The police power is not to be limited to guarding merely the physical or material interests of the citizen. His moral, intellectual and *591 spiritual needs may also be considered.’ ” (Nettleton Co. v Diamond, 27 NY2d 182, 192-193.)
The holding of the Court of Appeals in Nettleton Co. v Diamond (supra) specifically states that the police power extends to promoting the moral, intellectual, and spiritual needs of its people. It must be concluded that a statutory scheme to encourage and facilitate the adoption of children certainly involves the moral needs and welfare of the State’s citizens, as well as the physical welfare of the children involved. Accordingly, it is concluded that adoption is an area subject to the State’s exercise of its police power.
It cannot be concluded that the Constitution envisaged rights such a "personality” or an unfettered right to receive any information one might desire. Petitioner has neither shown a valid basis for concluding from either the United States or New York Constitutions that such rights exist or if they do exist how they are violated by the statute at issue exceeding the legitimate exercise by the State of its police powers. No right to privacy of this petitioner is conceivably at issue. If any person’s privacy is involved, it is the possible right to privacy of the natural parents.
The statute does create a differential between the ability of an adoptee to obtain original birth records as against a nonadoptee. Implicit in this distinction is the creation of two classifications of citizens. Careful consideration has been given as to whether this is offensive to the constitutional guarantee to all our citizens of equal protection under the law.
Petitioner asks that in determining constitutionality that the more exacting "strict scrutiny” test be applied to the statute rather than the less demanding criteria of ascertaining if a rational basis exists for its provisions. Under the criteria petitioner wishes applied, it would be the duty of the court to determine if, to the extent adoption records and adoptees birth records are sealed, the Legislature has enacted limitations which have been drawn with sufficient narrowness so as to limit individuals to the minimum extent that is required to effectuate a legitimate State interest (Roe v Wade, 410 US 113, 155; Kramer v Union School Dist, 395 US 621, 627; Shapiro v Thompson, 394 US 618; Griswold v Connecticut, 381 US 479, 485; Aptheker v Secretary of State, 378 US 500, 508).
The "strict scrutiny” test is applicable only in limited circumstances. It is to be applied "only when the classification *592 impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage to a suspect class.” (Massachusetts Bd. of Retirement v Murgia, 427 US 307, 312, emphasis added; see, also, San Antonio School Dist. v Rodriguez, 411 US 1, 16.)
The characteristics of a suspect class are set forth by the United States Supreme Court in Massachusetts Bd. of Retirement v Murgia (427 US 307, 313, supra): 'Rodriguez, supra, [411 US] at 28, observed that a suspect class is one 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.’ ” It cannot conceivably be concluded that in the enactment of section 114 of the Domestic Relations Law, the Legislature sought to place adoptees in a suspect class to their peculiar disadvantage (Mathews v Lucas, 427 US 495). It is noted that in Mathews v Lucas (supra) the United States Supreme Court held illegitimates not to constitute a suspect class. It is impossible to conceive that adoptees constitute a suspect class.
There remains the question as to whether a "fundamental right” of petitioner is here involved. Every restriction on individual desires or actions does not involve what the law has delineated as a "fundamental right.” The boundaries of such rights are relatively clear. For the petitioner to be deemed to have a "fundamental right” to learn the names of her natural parents without meeting the statutory requirement to show good cause, the right to such relief must be either implicit in the concept of ordered liberty or explicitly or implicitly granted by the Constitution (San Antonio School Dist. v Rodriguez, 411 US 1, 33-34, supra; Roe v Wade, 410 US 113, 152, supra; Palko v Connecticut, 302 US 319, 325). Certain matters relating to the "family” have been determined to be fundamental rights. These include, inter alia, procreation, marriage and divorce (Roe v Wade, supra; Eisenstadt v Baird, 405 US 438; Griswold v Connecticut, supra; Loving v Virginia, 388 US 1; Boddie v Connecticut, 401 US 371). On the other hand, other cases have held that classifications affecting the "family” or based upon legitimacy are not subject to the "strict scrutiny” test based upon the abridgment of a fundamental right (Mathews v Lucas, 427 US 495, supra; Labine v Vincent, 401 US 532; Dandridge v Williams, 397 US 471).
Neither within the Constitutions of the United States and *593 the State of New York, nor in the multitude of cases concerned with their provisions, can any explicit or implicit constitutional guarantee be discerned which would guarantee to petitioner the right to view the records at issue. The court is both understanding and sympathetic to petitioner’s curiosity about her forebears. It is an interest shared with legions of her fellow citizens who, to widely differing degrees, dependent on a multitude of varying circumstances, are capable or incapable of satisfying their interest in their genealogy. However, it cannot be concluded that obtaining the information at issue goes to the ability of petitioner to enjoy the fundamental liberties required to freely pursue any activity basic to a full life. Countless citizens drink of the cup of liberty to the fullest extent without any information as to their forebears. It is noted that to the extent one has a peculiar need for genealogical information, the New York statute has made provisions. The request of petitioner for application of the "strict scrutiny” test must be denied as inapplicable and the issues determined by the "rational basis” test. This finding as to the appropriate standard applicable to the issues is not intended to imply that if it were necessary to use any other standard, a conclusion has been reached that a different result would be required on the issue of constitutionality.
The United States Supreme Court in Lindsley v Natural Carbonic Gas Co. (220 US 61, 78-79) used the following language to explicitly set forth the appropriate tests to be here applied in determining if a statute which creates classifications is offensive to the constitutionally guaranteed right to equal protection: "The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such *594 a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. Bachtel v. Wilson, 204 U. S. 36, 41; Louisville & Nashville R. R. Co. v. Melton, 218 U. S. 36; Ozan Lumber Co. v. Union County Bank, 207 U. S. 251, 256; Munn v. Illinois, 94 U. S. 113, 132; Henderson Bridge Co. v. Henderson City, 173 U. S. 592, 615.” (See, also, Massachusetts Bd. of Retirement v Murgia, 427 US 307, 313, supra; Usery v Turner Elkhorn Mining Co., 428 US 1; Eisenstadt v Baird, 405 US 438, supra, MacDonald v Board of Election, 394 US 802, 809; Barrett v Indiana, 229 US 26.)
The Court of Appeals in Matter of Dorn "HH” v Lawrence "II” (31 NY2d 154, 158) stated the governing principle as follows: "It is fundamental, of course, that the Legislature may classify persons for purposes of legislation without infringement of the equal protection guarantee and that its discretion in this regard is broad and will not be disturbed if any state of facts can reasonably be conceived to sustain its classification (Matter of 436 W. 34th St. Corp v McGoldrick, 288 N. Y. 346, 350, mot. for rearg. den. 289 N. Y. 673; Shielcrawt v. Moffett, 49 N. Y. S. 2d 64, 76, affd. 268 App. Div. 352, revd. on other grounds 294 N. Y. 180, mot. for rearg. den. 294 N. Y. 840; New York R. T. Corp. v. City of New York, 303 U. S. 573) or even if the classification be fairly debatable (Matter of Presnell v. Leslie, 3 N Y 2d 384, 390, mot. for rearg. den. 4 N Y 2d 1046), provided only it shall not be palpably arbitrary (New York ex rel. Bryant v. Zimmerman, 278 U. S. 63).”
The enactment of article 7 of the Domestic Relations Law reflects a clear legislative recognition of the necessity for a statutory procedure which would promote the welfare of infants by the establishment of a legal parent-child relationship where one does not naturally exist. The encouragement of the adoption of children is indisputably a legitimate legislative goal. Petitioner has not sustained her burden to show that a state of facts cannot reasonably justify the need for confidentiality of adoption records, except where good cause is shown. In the absence of such showing it cannot be concluded that the statutory provisions are arbitrary. Pertinent to this conclusion is the fact that the sealing of these records does not involve information relative to the petitioner alone, but also involves the right of privacy of the natural parents, wherever they may now be. It is noted in this case that the age information on the birth certificate supports a conclusion that both the natural mother and father could presently be alive. *595 Although the information suggests that locating them would be a far from simple task, it is within the realm of possibility, given a sufficient effort. Accordingly, it is determined that petitioner has not sustained her burden to establish that the view of the Legislature on the subject of confidentiality, as is reflected in the statute, has no rational basis.
Counsel for petitioner' notes that some States other than New York do allow adult adoptees open access to their adoption records. This circumstance cannot affect the legal questions before this court. That some States do allow adult adoptees access to adoption records is no more relevant to the issues before the court than the fact that most States have statutes closer to the present New York law. Each State is sovereign. It is neither appropriate nor proper for the court to determine which legislative view is wiser.
On the constitutional questions before this court, it is concluded that petitioner has not established the constitutional invalidity of the statutory provisions she placed at issue. The question of whether New York should adopt the position of some of her sister States in unsealing by statute the records of adult adoptees is a subject for legislative, not judicial determination. It is a change that cannot be successfully accomplished by constitutional attacks on the present statute, or a search for strained and impossible constructions of existing law.
The application is in all respects denied and the petition dismissed.